(No. 18795.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY MEYER, Plaintiff in Error.

*Opinion filed October 25, 1928.*

Scholes, O'Connor & Dougherty, and George W. Sprenger, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Henry C. Pratt, State's Attorney, and Roy D. Johnson, (Frederick F. Beckman, of counsel,) for the People.

Mr. Justice Dunn delivered the opinion of the court:

Henry Meyer was tried in the circuit court of Peoria county on an indictment for murder, was convicted of manslaughter, and prosecutes this writ of error.

The first assignment of error argued in the plaintiff in error's brief is that the court erred in not keeping the jury together during the trial, in charge of a sworn officer, but permitted them to separate during the recesses of the court and at night. The record does not show that the plaintiff in error objected to the separation of the jury. The case was called for trial on November 21, 1927, and on that day and the next the jury were selected, the evidence for the People was heard, the evidence for the defendant was heard in part, and the jury were excused until the next morning. In *McKinney* v. *People*, 2 Gilm. 540, the defendant was charged with murder and was sentenced to be hanged. The court in affirming the judgment said: "The law in capital cases undoubtedly is, that from the commencement of the trial until the rendition of the verdict, the jury, during all adjournments of the courts, should be placed in charge of an officer, unless it is otherwise ordered by the court by the consent of the accused and the attorney for the People. * * * In this case, if the jury did separate without the consent of the prisoner it was an irregularity, and the court below would, upon the fact being established, have been bound to set aside the verdict

and grant a new trial, unless such separation was the result of misapprehension, accident or mistake on the part of the jury and under circumstances to show that such separation could by no possibility have resulted to the prejudice of the prisoner. The prisoner was in court with his counsel, and if the court had permitted the jury to disperse without the consent of the prisoner, such fact, being established by a bill of exceptions, would have been sufficient ground to reverse the judgment. As it is, this court is bound to infer either that the court directed the jury to be kept together, or, if they dispersed, it was by consent."

In *Pate* v. *People,* 3 Gilm. 644, (an indictment for forgery,) the record showed that the jury were permitted to separate but was silent as to whether the separation was with the consent of the prisoner and as to whether the jury were in charge of a sworn officer when they retired to consider their verdict. The court, following *McKinney* v. *People, supra,* held that the record need not show what disposition was made of the jury during the progress of the trial and when they retired to agree on their verdict; that the presumption was that the court performed its duty in such respects, and that if the jury were allowed to disperse without the consent of the prisoner or to retire from the bar without being in the charge of a sworn officer, it was incumbent on the prisoner, if he objected to such irregularities, to introduce them into the record by a bill of exceptions; that the presumption from the record was that the prisoner consented to the separation of the jury, and that the court performed its duty by requiring a sworn officer to accompany the jury in their retirement.

In *People* v. *Casino,* 295 Ill. 204, the defendant was charged with murder, and we there held that in capital cases the right of a defendant to have the jury kept together and in charge of a sworn officer had always been recognized by this court; that the right should be accorded him without his having to make a positive request that the court

grant him the right. The record in that case recited that the court stated, in permitting the jury to separate, that neither counsel had requested that the rule be enforced, and for that reason he was not going to enforce the rule. It thus appeared that Casino had not consented. It was said that this could not be taken against him as a waiver of his right to have the rule enforced, because for him then to have requested the enforcement of the rule would have been to risk the probability of prejudicing the jury against him. In the present case it did not appear that the plaintiff in error did not consent, and the presumption, in accordance with the two previous cases, will be indulged that he did consent.

The homicide occurred on Monday morning, February 14, 1927, in the residence occupied by the two brothers, Henry and Dominick, on the State road leading from Peoria to Wyoming, Route 30, at Dunlap. They were farm laborers and were bachelors, living and keeping house together. Henry was fifty-five years old and Dominick three years older. No other person was in the house. The plaintiff in error shot Dominick with a .32-caliber revolver and immediately went to the door and called loudly and excitedly for help. Harrison Dimon, a neighbor living about seventy or eighty feet away and directly across the road, heard the call through the closed doors of his house. He came in answer to the call. When he got to the door of the Meyer house Henry said: "Come on in, Harrison; see what I have done; I have killed my brother." He was standing in the doorway. Dimon went in the house to where Dominick was lying on the floor and then went back across the street, told his wife to call the doctor, and returned. When he came back Dominick was just turning over on the floor on his face. Dimon rolled him over on his back, went to the door and called some of the neighbors. Dr. Wilmot and Walter Ford were the first to come. The doctor came five or six minutes after Dimon got there.

Henry said: "That is an awful thing for a man to do—to shoot his brother; I don't know what I am going to do now; I guess the best thing I can do is kill myself." Henry was apparently very much excited. He was talking about everything and about half crying. After Dimon came back from telling his wife to call the doctor he picked up some bullets off the floor and the table—two loaded and one empty shell from the floor and two loaded from the table. He later handed them to Dick O'Brien, a deputy sheriff. Henry went up-stairs and came back. Dimon tried to quiet him and locked the stair door, waiting for others to come. Henry paced the floor, back and forth, from one room to another, out on the porch and back again. He tried to go up-stairs two or three times but Dimon would not let him. When Ford came, Dimon and Henry were in the front room, scuffling, Dimon trying to prevent Henry from going up-stairs and Henry trying to go up, saying that he wanted to kill himself. He continued these efforts after Ford came, but Dimon and Ford by their united efforts held him back. Ford went up-stairs but could not find any weapon. Later the two went up together and found a small .32-caliber revolver in the top of a trunk. It was empty and Ford kept it in his possession.

Ford's testimony was to the same effect as Dimon's. When he arrived at the house he found Dimon struggling with Henry, and he started to help Dimon. He did not know why he was helping Dimon but later learned that Henry wanted to kill himself. Ford asked what the trouble was. Dimon nodded toward the kitchen, and Ford saw "Dome" Meyer lying on the floor. Just then Henry made a rush and took them into the kitchen where Dome was, and looking down at him said, "Poor Dome; I didn't mean to do it," and then made an attempt to go up-stairs, saying he wanted to kill himself. They kept him from going up-stairs, and the next to come was Dr. Wilmot. After he came Ford went up-stairs but did not find anything. A

few minutes later he went up with Dimon and found the revolver in the top of the trunk, under the lid. Henry said his brother hit him on the head; that "he wouldn't let me go to Princeville this morning" and I shot him; that his brother struck him a blow, but he did not say whether it knocked him down or not. He rubbed his hand across his forehead constantly and was crying and wiping the tears at the same time. Ford did not see any marks or abrasions on his face.

Dr. Wilmot testified to finding Dominick on the floor on arriving at the house and to his dying within thirty seconds afterward. He examined the body at the autopsy and found the bullet wound and the bullet. The wound was in the left side, below the nipple, between the seventh and eighth ribs. The bullet penetrated the left lung, the left pulmonary artery and the pleura and was the cause of death. There were no powder burns on the body. Henry said that they were fighting and he shot him; that Dominick was trying to drive him out of the house. Henry was very excited and required a good deal of attention. He was not angry but was sorrowful and quite hysterical over killing his brother. This was the People's evidence.

The plaintiff in error testified that he had some trouble with his brother about eight days before the accident. On February 5 he and Ernest Knott made arrangements to set some traps. They caught an opossum on February 6, and a coon and an opossum on February 7. At the house that day his brother said to him, "What are you going to do about the hides?" Henry said, "I will have to give Vern a half interest in them hides." This made his brother mad, and he said, "Ain't them your traps?" and Henry said, "Yes, they are." He said, "You don't want to get so God damn thick together." He was mad. Knott came over the next day. He stopped at the east window and talked to Dominick through the window. Knott and Henry went away together to visit the traps and had another opossum.

The next morning, February 10, they took the traps and agreed to ship the hides Saturday, and did ship them that day to Sears, Roebuck & Co., in Chicago. They got $11.20. Henry testified further: "Sunday afternoon, February 13, we were sitting in the kitchen. My brother Dominick looked at me. He had a dirty, desperate look in his face. He said, 'What are you going to do? Are you going to give Ernest Knott a half interest in them hides?' I said, 'The man has a right to a half inerest.' He cussed me up and down and he had such a desperate look on his face and raised off his chair two or three times. I thought sure the man was coming onto me. I went up-stairs and put this gun in my pocket. It was a thirty-two. I came back down-stairs and sat down on my chair. The rest of Sunday afternoon and evening there wasn't a word spoken between us. We had supper that night the same as usual. He put the stuff on the stove and the two of us put it on the table. We washed the dishes and put them back in the pantry. Not a word was spoken during that time. I went to bed between seven and eight o'clock. My brother went to bed later. Not a word was spoken since the conversation in the afternoon. Monday morning, February 14, I got up between half-past six and seven o'clock. I got up first. I heard him dressing shortly after I got up. We had breakfast as usual. There was no conversation between us. I emptied the dishwater and Mr. Knott asked me to go over and listen to his new radio. I told him, 'I am going to Princeville this morning and I can't; I won't be back for several days.' After I went back to the house I went up-stairs and put on my overshoes and brown sweater. I took my light coat and my heavy coat and cap and came back down-stairs and laid them on the table. I had the gun in my pocket. I had put it in there on the morning of February 14. When I got down-stairs I put my clothes on the table, sat down by the stove and took off my glasses. Dominick was sitting at the east side of the kitchen, next

to the east window. I was on the north side of the stove with my foot on the open oven door. We were about six feet apart. There was not a word said until he spoke up and said, 'Ain't you going to get a bucket of water this morning?' I says, 'Yes, I can get a bucket of water.' He says, 'You —————, you had better or I will knock your damn head off.' I said, 'Don't you touch me.' I had no more than said it when he jumped up and struck me. He knocked me back over the chair against the north window sash, which extends about four or five feet south of the door that goes to the hard road. He hit me with his right fist. I staggered back up against the window frame of the window next to the wall, and as I staggered back I drew the gun, and as I drew the gun the man was like this: the left hand was here and the right hand drawn back. He gave me another hard lick and I drew the gun and shot him. I shot to scare him. I didn't mean to shoot him, but it struck him. He staggered back to the northwest corner of the table, turned around a little, got hold of the table and walked around between the wall and table and headed towards the east door, falling with his head just a little angling towards the southeast and his feet pointing a little northwest. He fell on his left side, his left eye and on his nose. When he fell I opened the west door, which was locked, and hollered for help. I hollered, 'I want help!' two or three times and saw nobody." Finally Harrison Dimon opened his door and came over. He was the first to appear and he got the doctor. Henry threw out the cartridges, went up-stairs, put the revolver in his trunk and came down. At the time he shot he believed his brother was going to inflict great bodily harm upon him; he "knew it to be a fact."

The plaintiff in error further testified: "I had other trouble with my brother at Chillicothe seven years ago. It started over some crackers I had bought. He knocked me down, hit me several times over the head, leaving marks

which are still visible on my face, and also choked me. My brother Frank pulled him off, and as he pulled him away he kicked me over the penis and laid me up for quite awhile. On February 14, this year, I weighed between 155 and 160 pounds. Dominick was fifty-eight years old, considerably larger than me, being four inches taller and about twenty-five to thirty pounds heavier. He was stronger than me. * * * No one was present at that fight but my brother Frank and Dominick and myself. Frank and Dominick are both dead. My brother and I had trouble four or five times in the last seven years. We bought the home in Dunlap in 1921 and lived together. We were friendly then. We did not have any fights—just trouble. I never cussed my brother. I didn't dare to. I did not call him any names on Sunday, February 13. I took his abuse. * * * I didn't say anything at all to him. I didn't dare to cuss him. The cuss words all came from Dominick. * * * I got the gun Sunday afternoon, February 13, and stuck it in my pocket. I saw he was going to jump on me.

Q. "If he jumped on you, you were going to shoot him and kill him?

A. "No; I didn't intend to kill him; I didn't intend to hit him.

Q. "Why did you stick the gun in your pocket Sunday afternoon?

A. "To scare him away. * * *

Q. "That is the way you were going to scare him—with the hidden revolver?

A. "I was going to pull it and scare him away. He didn't make any attempt to strike me Sunday afternoon. He only raised up out of his chair and looked desperate. I stayed there that afternoon, ate supper, helped my brother. We ate at the same table, washed the dishes and sat around until I went to bed. I put the gun back in the trunk. I had gone to bed and thought I was safe. I put the gun in my pocket the next morning to scare him away from me.

I didn't intend to shoot him—just to scare him away. The gun was loaded. I was afraid of him. He was all right except when he got mad. He had a mean temper. I didn't get mad. I didn't dare to, because I was afraid. * * *

Mr. Pratt: "Was there anything to stop you from leaving that home that Sunday afternoon?

A. "I was going to Princeville the next day, to leave for several days. I had on my overalls when I was arrested. That was the way I intended to go. I was standing before the stove about two minutes. I took my glasses off to clean them, when he looked up at me and said, 'Ain't you going to get a bucket of water this morning?' That is a job he always did. It was only a quarter of 8:00 and the train didn't get there until about 8:43 or 8:45. I never warned him and I didn't shoot him intentionally. I shot to scare the man away. I unlocked the west door, which was nearest to me. That door led to the hard road and that is the door I unlocked and hollered for help. I didn't go to aid him at the time. I wanted help. I took the bullets out of the gun when I came around the table and looked at my brother. I don't know why I did it. I never thought anything about attempting to get away with the evidence. I took the gun up-stairs in my trunk. I didn't hide it. I didn't want to carry it on me. I had it when Harrison Dimon was called. I went right to the west door and opened it and hollered for help, with the gun in my hand. After I had been on the west porch I went between the table and the north wall, opened the door and hollered for help. I went right back between that table and the north wall. I went out on the porch and hollered several times until Harrison Dimon came out and I told him to come over. I had the gun right in my hand. I went up-stairs after Mr. Dimon got there."

Ernest Knott testified that he had known the two brothers for about twenty-five years and had made an arrangement with Henry about trapping about the sixth or

seventh of February. He saw Dominick on the Saturday before the 14th of February and started talking to him through the window, but he acted so dangerous mad that Knott walked away from the house. He saw he was mad and he didn't want any trouble, so he walked away. He worked with Dominick about seven years and he was surely a strong man. He was larger than Henry and weighed twenty-five or thirty pounds more.

John H. Meyer, an older brother of Dominick and Henry, sixty-three years old, testified that Dominick weighed around 185 or 190 pounds about the fourteenth of February. He was a stout man and he would hold a grudge against you if he got mad. He had a bad temper. He would fight and wouldn't say many words. He had a knockout blow. The defendant was no match against him. Henry and Dominick seemed to get along fine.

Mrs. Margaret Moore, a sister of Dominick and Henry, living at Chillicothe, testified that she remembered the trouble at Chillicothe about seven years ago. She saw Henry the next day after the fight. His face was all marked, the skin off in places. Dominick had a terrible temper. He was ready to fight most any time. He was larger than Henry—about two or three inches taller and heavier in every way. Frank parted Henry and Dominick. Henry did not have a bad temper. He didn't pick quarrels with anybody. She had visited them in Dunlap and stayed as long as three weeks at a time.

Henry Pullen, whose wife was a niece of Henry and Dominick, testified that he had been acquainted with Henry and Dominick about thirty years. He did not see the fight at Chillicothe but saw Henry the next day. His face was marked up and scratched. He visited the home in Dunlap and sometimes stayed all night and ate at the table with the brothers. They were getting along all right.

Dr. M. G. Cutler, a physician living at Princeville, testified that he knew the defendant and his brother, Dom-

inick. He was called to view the body of Dominick at Princeville on February 14 or 15 and made an examination. The bullet wound was on the left side, about an inch or an inch and a half below a line drawn through the two nipples, and when the arm was at rest the wound was hidden by the arm. If the arm had been down the bullet would have struck the arm. If the arm had been in an upright position the bullet would have passed in through the body without touching the arm. He weighed about 160 pounds and was muscular.

Lester Tuttle, who lived in Chillicothe and was an operator on the Santa Fe railroad, testified that he knew Henry and Dominick. They were his wife's uncles. He was acquainted with Dominick's general characteristics with reference to temper. He had a rather surly disposition. He would get mad apparently without any cause. He was very unreasonable and would apparently get clear beyond any sensible control of himself. Under those conditions he would fight.

The defendant called a large number of witnesses who were sworn on his behalf. The court asked if these witnesses were character witnesses, and being informed that they were, limited the number of such witnesses to eight, with the understanding on the part of the State that no witnesses would be called to controvert the testimony as to the character of the defendant. The eight witnesses who were permitted to testify, testified to their acquaintance with the defendant for a period ranging from five years to thirty-five years; that they knew his reputation as a peaceable and law-abiding citizen and that it was good. They lived at Princeville, Dunlap and Peoria, and included a supervisor for about twenty years, who was chairman of the board in 1919, a banker, merchants, barber, real estate dealer, and farmer and stock-raiser.

The killing of the deceased by the defendant having been proved by the People beyond a reasonable doubt, the

burden of proving circumstances of mitigation or that justified or excused the homicide devolved, under the statute, on the defendant. It was not necessary for the People to prove a motive for the homicide, (*People* v. *Corder,* 306 Ill. 264,) but the presence or absence of a motive for a person to commit a crime is competent and material in determining whether he did, in fact, commit it. (*People* v. *Holtz,* 294 Ill. 143.) Where the defense to a charge of homicide is that the homicide was accidental or in self-defense, evidence of a lack of motive to commit the crime is competent in connection with the other circumstances in the case on the question of the defendant's guilt. The record contains no evidence of any motive which would make the defendant desire the death of his brother. The defendant was a peaceable, law-abiding citizen, living with his brother on good terms, and no question is made that such was his character. It is contrary to reason to believe that he would deliberately arm himself and plan a quarrel with his brother for the purpose of taking his life or doing him a bodily injury. The verdict found that he did not do so, for it acquitted him of murder. The evidence shows without dispute that the deceased was a strong man, a fighter, with a surly disposition, a bad temper and a knockout blow, ready to fight almost any time, who would get mad apparently without cause, was unreasonable, would get apparently beyond any reasonable control of himself and under these conditions would fight. He was much larger than the defendant—taller and heavier—and the defendant was no match for him. The defendant had reason to know and fear these traits, for a few years previously he had had an actual physical demonstration of the effects of them on his own person. He was not obliged to submit to another such beating before exercising his right of self-defense. *People* v. *Durand,* 307 Ill. 611; *People* v. *Sterankovich,* 313 id. 556.

The only witness of events at the time of the homicide was the defendant. He was vitally interested in the result

of his trial. The jury were bound to consider and weigh his testimony but not to believe it. It was to be weighed and tested by the same tests as the testimony of other witnesses, taking into consideration his interest and the extent to which he was corroborated, if at all. It was not to be rejected merely because he was the defendant. Moreover, in our review of the judgment we must give weight to the fact that the jury saw all the witnesses at the trial and had the opportunity of judging their credibility, not only from their words but from their appearance and conduct on the witness stand, and that the verdict has been approved by the trial judge.

After a careful consideration of all the evidence in the record, having in mind the limitations on an appellate court in reviewing the verdict of a jury, we are convinced that the evidence is not sufficient to remove all reasonable doubt of the guilt of the plaintiff in error. He is entitled to the benefit of his own peaceable disposition and good character, the evidence of which is not questioned, and of the vicious temper and violent disposition of the deceased, the evidence of which is also unquestioned. He was not required to prove the circumstances justifying or excusing the homicide beyond a reasonable doubt or by a preponderance of the evidence. It is sufficient if on the whole evidence there remains a reasonable doubt of his guilt, (*People* v. *Willy,* 301 Ill. 307,) and we are convinced that there is such reasonable and well founded doubt of his guilt as requires a reversal of the judgment.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*