THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ROSEMARY PAPPAS, Defendant-Appellant.

First District (1st Division)   No. 76-1013

Opinion filed October 30, 1978.

Harry J. Busch and Carl P. Clavelli, both of Chicago (Sherman C. Magidson, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a bench trial, Rosemary Pappas (defendant) was found guilty of the murder of Peter Pappas, her husband. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) She was sentenced to 14 to 20 years. She appeals.

In this court, defendant urges that the State failed to prove her guilty beyond a reasonable doubt because the evidence was insufficient to rebut the evidence of self-defense and the absence of a motive was a material factor; evidence of the motive was not admissible without proof of knowledge by the defendant and admission of the testimony of the pathologist not contained in his report was error. The People urge that the evidence proved guilt beyond reasonable doubt and rebutted the proof of self-defense; since the evidence established guilt beyond a reasonable doubt, proof of motive was unnecessary; evidence of an extramarital relationship in which deceased was involved did not constitute error because the trial court did not consider this evidence and the evidence was not prejudicial and, finally, the testimony of the pathologist was properly admitted as defendant failed to object to the evidence at trial or to preserve the point for review and the testimony was based on the knowledge of the pathologist.

Defendant and the deceased were husband and wife. The deceased was employed in the customer services department of an airline. He became a friend of a female fellow employee. She testified that, starting in December of 1974, they spent some time together almost every day at work and outside of work. On Saturday night, February 15, 1975, the deceased drove her home at about 5 p.m. He left and picked her up again at about 9 p.m. They went to a movie together. At about 2 o'clock on the morning of February 16, 1975, the deceased drove her home and left her about 1 hour later.

A lady named Theresa Sinnema was a friend of Lisa Mangino, mother of the defendant. Mrs. Sinnema testified that, at about 6 o'clock that morning she was awakened by a telephone call from Lisa Mangino. She went immediately to the Mangino home. She saw the defendant standing in the kitchen dressed in a nightgown and robe. On direct examination the witness testified "it was almost like she [defendant] was unusually calm * * *." On cross-examination the witness testified that defendant's appearance was "not normal." Mrs. Mangino was upset and crying. The witness further testified on direct examination that defendant told her that deceased had chased or threatened defendant with a gun and that he had been shot accidentally. On cross-examination she testified that she did not know if this statement was made by defendant or by her mother. Mrs. Sinnema and the defendant proceeded together to the defendant's home by automobile. Mrs. Sinnema's husband followed in another car.

Mrs. Sinnema testified that she saw deceased in his bed at home. She did not enter the bedroom but her husband did. Her husband told her to call the police and she did so. The police arrived within 5 minutes. She did not touch anything except the telephone.

Her husband, Edmond Sinnema, testified that he entered the

bedroom and saw the deceased on the bed. There was blood on the pillow. The covers were drawn up about the deceased. He also saw a gun on the kitchen table. Neither he nor anyone in his presence touched the gun. An officer picked it up later.

Police Officer John Kierzyk testified to receipt of a police call regarding an "accidental shooting" at the home. When he arrived he found the deceased in bed, on his right side facing the east wall of the room. He saw a huge amount of blood in the rear area of the head and also on the pillow. He did not touch the body. The body was covered with a sheet up to the neck area including the entire top shoulder area. The officer pulled the sheet down approximately 12 inches. The body disclosed no vital signs. The officer identified a series of photographs and marked one to indicate the position of the sheet prior to being pulled down.

Dr. Ti Li An, a qualified medical doctor and pathologist who specialized in forensic pathology, testified that he performed an autopsy upon the body. He described an entry bullet wound at the back of the head and an exit wound above and to the rear of the left eyebrow. There was a bullet fragment which could be felt at the exit wound. That fragment was removed and was received in evidence. In his opinion the path of the bullet was forward and leftward from the back of the head to the front at the vicinity of the left eye. In his opinion the cause of death was laceration of the brain. He testified on direct examination without objection and also on cross-examination that he did not observe any powder burns on the head of the deceased. This conclusion was reached from visual observation only, without the use of instruments.

Police Officer Gregory Sprague testified that he had accompanied Officer Kierzyk. On the kitchen table he found a Smith & Wesson revolver, .38-caliber with a 4-inch barrel. The hammer was cocked when he first saw it. He returned the hammer to normal position and removed the cartridges. The six cylinders of the gun contained four live cartridges and two empty casings. The firing pin was behind a live round. The two spent casings were to the left or counterclockwise from the firing pin. In his opinion some person had pulled the hammer back to the cocked position after the gun had been fired. On cross-examination the officer testified that his written report made no mention that the gun had been cocked. He handled the weapon without regard to effect on fingerprints because at that time he was advised only that there had been an accidental shooting in the home.

The officer also testified on direct examination that he then saw defendant and Mrs. Sinnema seated in the living room. He asked them what had happened. Defendant responded, "I shot him in self-defense." The officer told her to stop, stated that she was under arrest and her legal rights were then explained. In examining the bedroom, the officer pulled

the bed away from the wall. He found a bullet fragment on the floor. This was close to the east wall approximately 1 or 2 inches from the quarter round on the floor; about 4 to 5 feet from the south wall. The officer also observed a small indentation in the wallpaper on the south wall some 6 or 8 inches above the mattress. No other indentations were observed in the bedroom and no other pellets were found.

Donald J. Verbeke, an employee of the Northern Illinois Police Crime Laboratory, testified that he had 4 years of experience in the field of firearms and identification thereof, following a short period of laboratory training. He had fired test bullets from the pistol found on the kitchen table and he had examined the weapon, the test bullets, the expended shells and the bullet fragments above described. He expressed the opinion that both of the two discharged cartridge cases found in the weapon had been fired from this weapon. He also expressed the opinion that both of the two bullet fragments could have been fired from the same weapon. Each of the separate bullet fragments had class characteristics and also individual characteristics which were consistent with the test bullets fired by him from the weapon in question. However, his opinion could not be more definite because there was evidence of mutilation of each of these fired bullets.

As to the weapon itself, the witness testified that when the gun is cocked by drawing back the hammer, the cylinder rotates to the left or in a counterclockwise manner. A pressure of 10 pounds of pull is required to squeeze the trigger to fire the gun when it is uncocked. When the weapon is cocked a pull of 3½ pounds is required to fire it. The hammer must be manually drawn back in order to cock the weapon. The gun was examined for fingerprints but the only identifiable prints were those of Officer Sprague. There were smudges on the gun evidencing that it had been handled. The witness testified that no other scientific test of the fatal weapon had been employed or requested. At the conclusion of this testimony, the State rested.

Defendant testified that she and the deceased were 19 and 21 years old respectively when married for the first time in 1964. One child was born to them. They were divorced in 1970 for physical cruelty. They remarried in 1972 and thereafter a second child was born. Defendant was employed as a real estate agent and earned approximately $20,000 in 1974. The deceased earned some $14,000 that year from his employment. The defendant described in detail the relationship of the couple with the parents of both. In 1974 they purchased their home with funds supplied by the defendant's parents. The marriage was marred by disagreement. The defendant and the deceased had not occupied the same bedroom after the first week in January 1975. The deceased told her that he did not wish to sleep with her any more because he was not feeling good

physically and was suffering from a great deal of tension. She also testified that the deceased had incurred various gambling debts.

Defendant testified that the gun was usually kept on a closet shelf in the bedroom where the couple had slept. On one occasion, in December of 1974, the deceased came home and put the gun with its case in the children's playroom. Defendant testified that next morning her older daughter called her and said that the younger child had the gun. The defendant took it away from the child, put it back in the case and gave it to the deceased. She asked him not to leave the gun in the house. She told him she was terrified of the gun. He told her that he would do whatever he wanted. He then took the gun out of its case, opened up a door and fired the gun into the air. She testified that on other occasions she requested the deceased not to leave the gun in the house. He told her that he owed money and that he felt more comfortable with the gun in his possession. On cross-examination defendant testified that she had never hidden this gun, she had never told anyone that she had hidden it and specifically she had never told her friend, Mrs. Conrad Spirrison, that she had hidden the gun.

On Saturday, February 15, 1975, defendant arose early, went to work and thereafter prepared dinner for the family as well as for the parents of the deceased. The deceased stated that he was going out to play cards. His mother requested that he stay home and that the family play cards. Deceased refused. He accordingly left after dinner, as did his parents. Thereafter defendant's mother came and took the children to her home for the weekend as she generally did. Since defendant and the deceased had agreed that whoever went to bed first would sleep in the queen-size bed in the master bedroom, defendant went to sleep there.

She testified that about 5 a.m. she received a telephone call for deceased from one of his fellow employees. She looked over the house for the deceased and did not find him. She informed the caller and went back to sleep. Sometime later she heard the deceased come in. She told him of the call and stated that the message had been that it would be necessary for him to take a flight to Las Vegas that morning. The deceased responded with curses and started to get into bed. Defendant saw he was angry and she wanted to get out of the bed. She started to do so. The deceased was under the sheet. He grabbed her by her left arm and asked "where in hell" she thought she was going. She responded that she wanted to get out to a different bed. She heard a noise and turned. She saw that the deceased had his gun in his hand. She screamed and tried to pull away. She reached out. "Somehow" she "wound up on top of" the deceased. There was a tremendous explosion and there was blood. That was all that was clear to her.

She stated that the last thing she remembered was being on top of the

deceased "and the gun was in my hand." She also stated that she was not holding the gun but "it was sort of laying on my hand." The next thing that she recalled was being in the police station. She did not recall being at her mother's home but did recall the police being at her home and seeing Mrs. Sinnema. She had never at any time cocked this gun or any other gun by pulling back the firing pin. When the deceased got into bed, he was the closest one to the wall. He was then under the sheet. When she first saw the gun, it was in his right hand. That was when he grabbed her with his left hand. She had no idea as to whether deceased left the bed prior to the time she first saw the gun. Her recollection was that she heard one explosion. She did not remember cocking the gun and did not remember taking the gun from the hand of the deceased.

Defendant also testified that she was trying to get away from the gun and trying to protect herself. She did not at any time "contemplate" killing her husband. She did not intentionally shoot and kill her husband and she had no such intent that night and at the time of the explosion.

Defendant further testified that the bedroom had been freshly papered in 1974 between August and October. She had no knowledge or specific recollection of the indentation therein described by the police officer and reflected in photographs. After completion of her testimony, the defendant rested.

In rebuttal, the State called Mrs. Conrad Spirrison a friend of defendant who had gone to school with the deceased. She testified that she had telephone conversations with the defendant almost every day Monday to Friday for 3 years. During the first part of February 1975, or the end of January, in such a conversation, after defendant returned from a vacation trip, defendant told her about the gun and said that she had hidden it. The witness testified on cross-examination that she gave this information to a member of the family of the deceased shortly after the funeral; she told her husband about it and also advised the police.

In rebuttal the State also called Donald J. Verbeke, the firearms expert. He testified that he had examined the front of the cylinder of the gun in question. After a gun has been fired, there is a flare or mark from the discharge which appears on the front of the cylinder. This flare changes its color in about a week. At the time the weapon was examined, both of these flares had the same whitish-gray color. The witness also testified that in about 1 week the flares turn to a dark or bluish color. He noticed no difference between the flares at the time of examination. In his opinion, the 2 flare marks occurred at approximately the same time or within approximately a 1-week period of time. In his opinion, the appearance of these flare marks was inconsistent with the possibility that one was caused by discharging the gun during the first week of December

1974 and the other was caused on February 16, 1975. On cross-examination he added that flare marks could be changed by cleaning of the weapon after discharge. Also rubbing the face of the cylinder with the hand would affect the flare marks because of the presence of perspiration or natural oils.

In addition, the witness testified that he performed another test on the weapon on or about the 30th of August 1975, using the same ammunition as originally found therein. The witness fired the gun at paper targets from distances of direct contact, 2 inches, 6 inches, 18 inches, 6 feet and 10 feet. The distance from the target in each case was noted upon the test paper. At contact and at a distance of 2 inches the paper was torn by the muzzle blast and was smudged with powder residue. The discoloration was available to the naked eye. At distance of 6 and 10 inches the same phenomena were observed.

At a distance of 18 inches there was slight tearing of the paper, a few grains of powder were present and there was very little smudging. These traces of powder were visible with the naked eye. At a distance of 6 feet there was no smudging and very little unburned powder except for 1 or 2 grains. At a distance of 10 feet there was small tearing around the hole and no smudging or unburned powder was present. The witness further testified that the smudging and unburned powder residue would appear approximately the same on most substances that the weapon would be fired at.

The defendant also testified in surrebuttal. She stated that she and the deceased had returned from Las Vegas on December 14, 1974. A few days later she had a telephone conversation with Mrs. Spirrison. She told Mrs. Spirrison that she had taken the credit cards of the deceased from his wallet to stop him from running up bills. She stated that she never told Mrs. Spirrison that she had concealed the gun. She spoke with Mrs. Spirrison after the deceased had fired the gun into the air. She simply told Mrs. Spirrison that she had found the gun in the hand of her younger daughter and had taken it away from her.

■■ In deciding the first contention of defendant regarding reasonable doubt, we must first consider whether defendant was acting in self-defense. Defendant would be justified in the use against her late husband of force likely to cause death if she reasonably believed that this was necessary to prevent imminent death or great bodily harm to herself. (Ill. Rev. Stat. 1975, ch. 38, par. 7—1.) Since the defendant raised this affirmative defense by her own testimony, the State had "the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense" involved. (*People v. Williams* (1974), 57 Ill. 2d 239, 242, 311 N.E.2d 681, citing Ill. Rev. Stat.

1969, ch. 38, par. 3—2.) The issue of self-defense is generally a question for resolution by the trier of fact. *People v. Holtz* (1974), 19 Ill. App. 3d 781, 790, 313 N.E.2d 234, *appeal denied*, 56 Ill. 2d 589.

The use of circumstantial evidence such as in the case before us has been authoritatively described in *People v. Fletcher* (1978), 72 Ill. 2d 66, 71, 377 N.E.2d 809, which quoted from *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, as follows:

> " 'We find apposite here the statement in *People v. Marino*, 44 Ill. 2d 562, 580, that "it is well settled that the commission of an offense may be established entirely by circumstantial evidence. As we observed in *People v. Bernette*, 30 Ill. 2d 359, 367, 'a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People v. Russell*, 17 Ill. 2d 328,) it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Magnafichi*, 9 Ill. 2d 169; *People v. Grizzel*, 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt.' " Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Hanson*, 59 Ill. 266; *People v. Branion*, 47 Ill. 2d 70.)' "

With these principles in mind we will analyze the evidence before us. Defendant's theory of self-defense is based upon her own testimony. She testified that when she saw the deceased with the gun in his hand she screamed and tried to pull away from him. She reached out and "somehow wound up on top of Peter [the deceased]" with the gun in her hand. She stated that she was not holding the gun but "it was sort of laying on my hand." She also testified that she saw the gun when deceased grabbed her with his left hand. She had no idea as to whether the deceased left the bed to obtain possession of the gun.

In our opinion, aside from the rather vague quality of this delineation, many other circumstances rebut it effectively and prove guilt beyond reasonable doubt. The first information received by the police was that there had been an accident. This information could have come originally only from the defendant and then from defendant's mother and Mrs. Sinnema who called the police. Consequently, the original defense theory is accident and the thought of self-defense is formulated later when a police officer makes his first general inquiry. Clearly the record does not reflect the classical type of self-defense where deadly force is intentionally used against an aggressor. Astute counsel for defendant

attempts to clarify this situation by citing testimony of defendant that the "accident" occurred while she was trying to protect herself.

The record is definite that the deceased was covered with the sheet up to the neck area when the police entered the room. There is no evidence regarding the position of the body or of the sheet having been changed by any person before the police arrived. This physical fact is entirely incompatible with and contradictory to the testimony of defendant. If deceased left the bed to get the weapon or if it had been secreted in or about the bed and a struggle ensued, the sheet would not have remained pulled up to his neck after the fatal shot had been fired.

Another important physical fact is the position of the fatal wound in the back of the head of deceased. It is quite incredible to believe that if the incident occurred in accordance with the testimony of defendant the wound would have been inflicted in that area. It is undisputed that the bullet entered the back of the head and exited at the front near the area of the left eye. If the shooting occurred as described by defendant, it may have been necessary for her to force the hand of the deceased, which held the gun, entirely around to the back of his head for firing the fatal shot.

Still other matters must be observed. If defendant's version of the incident is correct, the gun with a 4-inch barrel would necessarily have had to be held by her or by the deceased in actual or virtual contact with the back of the head of deceased. It hardly requires expert testimony and the test targets above described to establish that in such case there would have been visible evidence of powder at the entrance wound. The testimony of the pathologist negates the presence of such a phenomenon. It would therefore appear necessarily that the gun was discharged at a greater distance from the entry wound than possible if defendant's version is true.

Defendant was not definite as to whether one or two shots were fired. She said her "recollection" was that she heard only one shot. There is considerable evidence in the record tending to prove that two shots were fired. The firearms expert referred to the fragments as "both fired bullets." This theory is supported by the expert testimony regarding the flares on the cylinder of the gun which showed, in the opinion of the State's expert, that two shots were fired from the weapon at or about the same time or within about 1 week from each other. Defendant attempted by her testimony to show that the deceased had discharged the weapon himself in her presence in December of 1974, some 2 months before. The expert testimony was thus contrary to this portion of defendant's testimony.

Furthermore, the fatal weapon was found on the kitchen table in cocked position. The uncontradicted evidence is that this permits the weapon to be discharged again by exertion of a force roughly equivalent to one-third of the force required to discharge it when not cocked. If

defendant's testimony is accurate regarding discharge of the weapon by her, it fails completely to show any reason for her to ready the weapon for another shot in this manner. The record shows that after firing, the gun could be cocked again only by an intentional manipulation. The only testimony by the defendant in this regard is that she had no recollection of what occurred immediately after the shooting.

We must also note that, taking defendant's testimony completely at its face value, assuming that the gun was gripped for offensive purposes in the hand of an angry male person, it would be extremely difficult to understand how defendant was able to loosen the weapon from his grasp, to transfer it to her own hand and then to reach around the subject and shoot him in the back of his head with the bullet travelling in a direct course to the area of the left eye. This theory is rendered more incredible by lack of testimony that defendant ever really seized or gripped the gun. She stated only that she tried to pull away, she reached out and that the gun was "sort of laying on my hand."

It must also be noted that defendant testified on cross-examination that she had never hidden the gun and that she did not ever tell Mrs. Conrad Spirrison that she had hidden the gun. When called on rebuttal, Mrs. Spirrison testified to a telephone conversation with defendant in which defendant told her that she had hidden the gun. Despite efforts by defendant's counsel in cross-examination of this witness, her testimony must necessarily be analyzed as a strong factor in discrediting the testimony of defendant.

■■ As part of the discussion on the weight of the evidence, defendant's brief contains a number of references to various erudite textbooks pertaining to scientific evidence in criminal cases. By citing from these various texts, defendant seeks to minimize the testimony of the weapons expert, Donald J. Verbeke, and the pathologist, Dr. Ti Li An. In our opinion, the matter of allegedly contrary scientific pronouncements which defendant seeks to insert into the record in this manner should have been brought before the trial judge by cross-examination of the experts. (*People v. Turner* (1976), 35 Ill. App. 3d 550, 563, 342 N.E.2d 158.) Counsel for defendant had full legal right to bring these authorities, and any others expressed in treatises and periodicals, before the court by cross-examination and to insist that the expert witnesses take account thereof in their testimony. *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 335-36, 211 N.E.2d 253, also cited in *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 558, 356 N.E.2d 779.

■■■ Defendant also attacks the qualifications of the experts. "Whether a witness is qualified to testify as an expert is within the sound discretion of the trial court." (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257. See also *People v. Yancey* (1978), 57 Ill. App. 3d 256,

262, 372 N.E.2d 1069, *appeal denied* (1978), 71 Ill. 2d ___.) From the record, we conclude that these expert witnesses were sufficiently qualified to state their opinions and the trial court was well within the range of proper exercise of discretion in receiving their testimony.

As a part of the argument on the weight of the evidence, defendant takes the position that absence of a motive which might impel a defendant to commit the crime is an important consideration where the evidence is circumstantial. It is a generally accepted rule of law that the State is not required to prove a motive for commission of a crime. (*People v. Hobbs* (1966), 35 Ill. 2d 263, 269, 220 N.E.2d 469, *cert. denied* (1967), 386 U.S. 1024, 18 L. Ed. 2d 463, 87 S. Ct. 1381; *People v. Reed* (1974), 23 Ill. App. 3d 686, 693, 320 N.E.2d 249, *appeal denied* (1975), 57 Ill. 2d 609.) However, the converse of the situation is true but only to the extent that where the proof of guilt is circumstantial the absence or presence of a motive may be one of the circumstances to be considered in the determination of guilt. *People v. Meyer* (1928), 331 Ill. 608, 620, 163 N.E. 453. See also *People v. Rowe* (1977), 45 Ill. App. 3d 1040, 360 N.E.2d 436.

Thus, this argument of the defendant is readily answered. The entire record hints strongly that defendant may well have had a motive for commission of the crime. The history of the marriage, although portrayed only in a general manner by the evidence, may contain sufficient proof of motive. Even if no motive existed for past conduct, the argument between these parties on the fatal night may well have resulted from the gradual deterioration of their relationship which the record shows. In any event, the presence or absence of motive is but one single circumstance. As above shown, there is a mass of evidence superimposed upon the inherent weakness of defendant's own theory which constitutes proof of guilt beyond reasonable doubt.

The courts of Illinois have held that where "the conviction of murder rests solely upon circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis." (*People v. Garrett* (1975), 62 Ill. 2d 151, 163, 339 N.E.2d 753, and authorities there cited.) However, in the case before us, as above shown, the defendant's own testimony presents a statement of fact which is insufficient to raise a reasonable doubt of guilt. Her testimony is vague to begin with and it is effectively contradicted and overwhelmed by the remaining evidence brought before the trier of fact. The trier of fact is not "required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt." *People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382, quoting from *People v. Russell* (1959), 17 Ill. 2d 328, 331, 161 N.E.2d 309.

In cases involving circumstantial evidence, it is not necessary for each link in the circumstances relied upon to establish guilt by itself to

constitute proof beyond a reasonable doubt. The only requirement, as above shown, is that the circumstances be of a conclusive nature and lead on the whole to the conclusion of guilt by a reasonable and moral certainty. Defendant's brief attacks the expert testimony as regards the test targets and advances the theory that a single shot was fired. The defendant's own testimony is not quite definite on the latter point. Defendant urges that the sheets may have been pulled up about the victim after he was shot, or by the "loving wife" who did so in a state of shock and then forgot what she had done. These arguments are simply examples of an attack upon individual links in the larger chain of circumstances which taken together are of conclusive nature and prove guilt to a reasonable and moral certainty.

■■ In the case before us the sum total of the arguments made by defendant in this court serve at best merely to raise issues of credibility. In every case brought before this court after a verdict of guilty in a bench trial, we are obliged to apply the principle that "it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733, and cases there cited.) We may not set aside the judgment of the trial court "unless the proof is so unsatisfactory as to cause a reasonable doubt of guilt to appear." (*People v. Lofton* (1977), 69 Ill. 2d 67, 73, 370 N.E.2d 517.) In the case before us we conclude that the finding of guilty is strongly and amply supported by the evidence beyond a reasonable doubt.

Defendant next urges that the evidence of motive was not admissible because of lack of proof that the defendant had knowledge of the facts. Defendant concedes and we agree that proof of motive is not necessary to convict for murder. It should also be added that motive is "merely one factor among many to be considered * * *" by the trier of fact. *People v. Koshiol* (1970), 45 Ill. 2d 573, 580, 262 N.E.2d 446, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209.

The first witness called by the State was the young lady who had been acquainted with the deceased. The defendant objected to this evidence and moved to strike it. The trial court denied the motion on the theory that the evidence was possibly competent to show that the deceased was alive when he left the witness at her home about 3 a.m. on February 16, 1975. During the argument the State's Attorney took the position that the evidence was competent as proof of motive. Defendant here urges that the evidence was not competent to prove motive because there was no proof that the defendant had knowledge of the relationship between deceased and the young lady. Defendant concedes the general presumption that in a bench trial "the trial judge has considered only competent evidence in reaching his verdict." (*People v. Gilbert* (1977), 68

Ill. 2d 252, 258, 369 N.E.2d 849.) However, we may not overlook the balance of the principle which teaches us that this presumption may be rebutted but only "where the record affirmatively shows the contrary * * *." *Gilbert*, 68 Ill. 2d 252, 258-59.

The record before us affirmatively shows that the learned trial judge was thoroughly informed as to the law bearing upon this subject and that he placed no reliance upon the questioned evidence. The trial judge cited *People v. Gougas* (1951), 410 Ill. 235, 102 N.E.2d 152, cited by defendant in her brief, as authority for the proposition that the evidence was not competent to show motive without proof that the defendant had knowledge of the existence of the facts in question. The trial judge specifically stated that there was no evidence that defendant had any knowledge of the meetings between deceased and the witness.

Thereafter in the post-trial motion of defendant, the point was raised again. In ruling on this motion, the trial court particularly stated that he had felt during the trial that the testimony in question was "not relevant to any issues that were presented." The court further stated that the evidence was not proper but that the incident was not such as to merit a new trial.

■■ We have, therefore, a situation in which the record before us affirmatively shows that the trial judge did not consider the questioned evidence as having any bearing upon or connection to the proof of motive. The trial court placed no importance whatsoever upon this testimony. Under these circumstances we find no error arising from this incident. See *People v. Glanton* (1975), 33 Ill. App. 3d 124, 145, 338 N.E.2d 30.

Defendant's final contention is aimed at the testimony of the pathologist, Dr. Ti Li An, that there was no observable evidence of powder burns surrounding the entry wound. The pathologist first testified that he had no independent recollection of his examination. The witness examined his report and stated that this refreshed his recollection. He then proceeded to testify to the facts shown in the report. It is defendant's theory that the entire testimony of the witness was based upon his report and not upon his own independent refreshed recollection. The presence or absence of powder burns was not noted in the report and protocol. Defendant concludes that the testimony regarding the burns should therefore have been stricken on defendant's motion. We reject this argument.

■■ To begin with, we find from the record that the witness stated that he was able to testify regarding the autopsy after his recollection had been refreshed by his report. This does not necessarily mean that his testimony is limited strictly to the items set forth in his report. He was not testifying from the report but from his own recollection as refreshed by that

document. It has long been the law of Illinois that a witness may refresh his recollection from virtually any source. The trial court has wide discretion in this regard. (*People v. Van Dyk* (1976), 40 Ill. App. 3d 275, 279, 352 N.E.2d 327, *appeal denied* (1976), 63 Ill. 2d 562.) After his recollection has thus been refreshed, the testimony then proceeds upon the independent recollection of the witness as thus refreshed. (*People v. Nickson* (1978), 58 Ill. App. 3d 470, 479-80, 374 N.E.2d 804, *appeal denied* (1978), 72 Ill. 2d ___.) If the recollection of the pathologist was not refreshed from the report, the subject was one for cross-examination to demonstrate his lack of recollection.

■■ In this regard, the situation before us is far different from *People v. Jenkins* (1973), 10 Ill. App. 3d 166, 171, 294 N.E.2d 24, relied upon by defendant. In *Jenkins*, the doctor admitted on cross-examination that he could not recall examining the patient and could in effect only repeat the information on the hospital record. (*Jenkins*, 10 Ill. App. 3d 166, 171.) *Jenkins* dealt with a medical record which was not competent evidence. (58 Ill. 2d R. 236(b).) The case before us deals with an autopsy record concerning which this court may take judicial notice. *People v. Garett* (1975), 62 Ill. 2d 151, 163, 339 N.E.2d 753.

■■ In any event, the defendant's motion to strike the testimony of the pathologist was based solely upon the alleged lack of professional qualifications of the witness. We have already considered and rejected this point. The issue above discussed concerning the testimony of the witness with regard to his recollection was not raised by the defendant at trial by way of objection or even by post-trial motion. Under these circumstances, where no specific objection is made to testimony at the trial, the point is waived. (*People v. Dukett* (1974), 56 Ill. 2d 432, 442, 308 N.E.2d 590, and the authorities there cited.) In addition, not having been preserved in the written post-trial motion, the point was waived as a ground for reversal. *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.

■■ We cannot agree with the contention of defendant that this record presents a point under the plain error exception. (58 Ill. 2d R. 615(a).) The rule is intended to permit the raising of errors which would otherwise deprive the accused of "substantial means of enjoying a fair and impartial trial * * *" and also "in criminal cases in which the evidence is closely balanced to consider errors that have not been properly preserved." (*People v. Howell* (1975), 60 Ill. 2d 117, 121, commenting upon the holding in *Pickett*, 54 Ill. 2d 280, 282.) The defendant before us was not deprived of a fair and impartial trial. On the contrary, the record reflects that the scholarly and diligent trial judge afforded defendant a fair and impartial trial in the most exemplary manner. Furthermore, as already pointed out, the evidence in the case before us may not be described as

closely balanced. In any event, as above shown, we find no error in this detail of the trial.

For these reasons the judgment appealed from is affirmed.

Judgment affirmed.

McGLOON and BUCKLEY, JJ., concur.