THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY COOPER, Defendant-Appellant.

First District (4th Division)    No. 80-430

Opinion filed June 4, 1981.—Rehearing denied July 8, 1981.

Walsh & Neville, of Chicago (Ronald F. Neville and Matthew P. Walsh, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Gino P. Naughton, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Henry Cooper, was indicted for murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). Following a bench trial in the circuit court of Cook County, he was found guilty and sentenced to 20 years in the Illinois Department of Corrections. On appeal, defendant raises the issues of (1) discrepancies between the indictment and the evidence; (2) the entry of expert testimony into evidence; (3) the admission of an out-of-court statement; and (4) whether he was proved guilty beyond a reasonable doubt. We affirm.

The record reveals that at trial Gloria Gray testified she was the wife of the decedent, Harry Burks. She stated that on the night of June 29, 1978, she received a telephone call from Rudolph Cooper, defendant's brother. Rudolph owned the 150 Club, a liquor store and lounge, where her husband worked part-time. In his telephone conversation with Gray, Rudolph stated he wanted Burks to come to the lounge and pick up some liquor. Burks consented, leaving the house shortly thereafter. The witness said the next time she saw her husband he was dead. She concluded her testimony by stating that her husband was right-handed and that he had known the defendant for several years.

James Kelly, a Chicago police officer assigned to the 5th Police District, testified that on the morning of June 30, 1978 he and his partner, Officer Edward Mahon, received a radio call reporting a suspicious man at 150 West 103d Street, Chicago. Upon arriving at that address, the officers found the premises occupied by the 150 Club. Officer Kelly said he and Officer Mahon entered the lounge and proceeded to a rear room. There, they found the decedent, later identified as Burks, seated at a desk with his head slumped forward, his chin on his chest, and a gun, which was pointed in an upward direction, in his left hand near his waist. The officer stated he took the gun, opened the cylinder and found four expended shells. He checked the body for vital signs and found none. There was a bullet wound approximately 1 inch behind the decedent's left ear. There was no evidence of powder burns. Officer Kelly further testified that defendant admitted being in the room when Burks was shot; that

defendant stated he saw Burks fire the gun into the ceiling and into his own head; and that defendant admitted ownership of the gun used. Officer Mahon's testimony was substantially the same as that of Officer Kelly.

Sergeant John Downey of the 5th Police Distict testified that he answered a call to go to the 150 Club. When he arrived, he immediately recognized defendant as a police sergeant also assigned to the 5th Police District. Sergeant Downey stated that upon observing the decedent he found what appeared to be a bullet wound on the left side of the head. He saw no powder burns.

Investigator Fred Hill of the Chicago Police Department testified that he investigated the shooting and interviewed defendant at the police station. Hill stated that defendant told him Burks was his employee and that after Burks returned from an errand he took defendant's revolver and started shooting. Defendant further told the investigator that once the shooting began, he and his brother, Rudolph, ran from the back room but returned about 5 minutes later and discovered Burks dead.

Aaron Smith offered testimony that he knew defendant and defendant's brother, Rudolph, and nephew, Chiffroneo. Smith was in the 150 Club on the night in question and heard gunshots coming from the back room. Thereafter, he saw defendant come out of the back room armed with a gun and firing at random. According to the witness, there were approximately five people in the front area of the Club; they all left quickly but he stayed and heard defendant say he killed Burks. Smith said he did not talk to the police immediately after the shooting. Further testifying, Smith said that the day after the shooting he saw the decedent's son, Nash Burks, who stated the incident had been set up to look like a suicide. Smith found out that no one had been arrested after the shooting. Burks called the police, who eventually interviewed Smith concerning the incident.

The parties stipulated that if the fingerprint examiner testified he would state he examined the .38-caliber revolver found in the decedent's hand and the gun bore a fingerprint identical to the fingerprint of defendant. The parties also stipulated that a firearms expert, if called, would testify that bullet fragments taken from the head of the decedent came from defendant's gun. It was further stipulated by the parties that Dr. Robert Stein is an expert in the field of forensic pathology. Dr. Stein performed the autopsy and testified at trial that there was no trace of gunpowder on the skin of the decedent; that when a gun is fired from more than a foot, there are normally no powder burns; that he formed the opinion that decedent's death was instantaneous and resulted from the bullet wound to the head; and that he issued a permanent death certificate listing the cause of death as homicide.

Defendant testified in his own behalf. He stated that he had known Burks for approximately 20 years and that Burks ran errands for his brother, Rudolph, who owns the 150 Club. The witness said that on the night of the incident Burks was sent on an errand; upon his return, defendant asked him to go out again to buy hamburgers. Burks did so, and when he returned defendant gave him $1.50. Burks told defendant the money was not sufficient, but defendant would not give him more.

Further testifying, defendant stated he then took his revolver out of the desk drawer and placed it on top of the desk so he could put on his holster. Burks then grabbed the gun off the desk. Defendant and his brother ran from the room, and as they were running the gun was being fired. The witness stated that when the shooting stopped he and his brother returned to the back room to discover Burks, dead, in the chair. According to the witness, he sat in the back room with the decedent until the police arrived. Thereafter, he told the officers that Burks had shot himself. Defendant stated that he did not remember telling the officers he had remained in the room while Burks was shot and further stated that he was not in the back room when Burks fired the gun nor did he see Burks shoot the gun.

The trial court ruled that there was no reasonable doubt as to defendant's guilt.

■■ Defendant contends that the discrepancy between the name of the victim originally shown on the face of the indictment and his actual name is an error which could have had an impact on the outcome of this case. Although the indictment charged defendant with the murder of "Burt Hampton" and was later changed to "Hamp Burks," we think it a matter of form rather than substance. Where, as here, no hint of surprise or prejudice to defendant is shown, allowance of such an amendment is not error. (*People v. Jones* (1973), 53 Ill. 2d 460, 465, 292 N.E.2d 361, 363.) The record is far too clear as to the identity of the victim to entertain the idea that harm may have been done by alteration of the victim's name on the indictment.

■■ Defendant also argues that the trial court should have stricken the testimony of Dr. Stein as an expert witness. It is significant to this court that the parties stipulated the fact that Dr. Stein is an expert in the field of forensic pathology. Therefore, it is only left for this court to determine when expert testimony is admissible and how its admission may be reviewed. In *People v. Carbona* (1975), 27 Ill. App. 3d 988, 1002, 327 N.E.2d 546, 560, we said:

> "Expert testimony is properly admissible when the subject matter is sufficiently beyond common experience so that only persons of skill or experience are capable of forming a correct judgment as to any connected fact. [Citation.] The prevailing view

is that the subject of self-inflicted wounds is not one of such common experience that laymen may not be assisted by the opinion of a doctor who has special knowledge regarding anatomy and injuries to the human body."

The testimony of Dr. Stein assisted the court in understanding the trajectory of the bullet and the effect on tissue in the area of the wound. Not only was Dr. Stein's opinion formulated for the benefit of the court, it was also a reflection of his duty as county medical examiner. Yet, the trial court was not bound to adopt the expert's opinion as its own or as the controlling factor in reaching a determination. We recognize that the trial court is afforded a wide latitude of discretion in determination of such admissibility unless it is clearly and prejudicially erroneous. (*People v. Stapleton* (1972), 4 Ill. App. 3d 477, 480, 281 N.E.2d 76, 78.) The testimony of Dr. Stein was an important aid to the trial court, was not erroneous, and did not merit exclusion from evidence.

■■ It is suggested by defendant that during the testimony of Aaron Smith repetition of statements made to him by the victim's son was improperly admitted. The decedent's son related to Smith his belief that his father's death had been made to appear as a suicide. The trial court ruled that the testimony was offered not to support the truth of the matter asserted therein but to show the state of mind of witness Smith when he talked with the police. We agree. Further, the probative value of the testimony far exceeded whatever prejudice may have occurred to defendant. Having reviewed the transcript on record, we do not find reversible error in the admission of testimony offered by Smith.

■■ Finally, defendant bases this appeal largely upon the assertion that the State failed to prove him guilty beyond a reasonable doubt. This case is one in which there was no eyewitness to the crime. The evidence used to support the conviction was, therefore, circumstantial.

"In cases involving circumstantial evidence, it is not necessary for each link in the circumstances relied upon to establish guilt by itself to constitute proof beyond a reasonable doubt. The only requirement, * * *, is that the circumstances be of a conclusive nature and lead on the whole to the conclusion of guilt by a reasonable and moral certainty." (*People v. Pappas* (1978), 66 Ill. App. 3d 360, 371-72, 383 N.E.2d 1190, 1199.)

We find the standard established in *Pappas* to have been met in this case. The record, including defendant's testimony, indicates that the shooting of decedent could only have been done by defendant or the decedent himself. In reading its decision, the trial court was aware of the evidence that defendant produced the gun; defendant's gun was determined to have been the weapon which killed decedent; the decedent's wound was

on the left side of his head and no powder burns were on his skin; the gun was found in decedent's left hand but decedent was known to be right-handed; and defendant was the last person to see the decedent alive.

The trial court indicated that defendant was not believable, and, while no single factor showed defendant guilty, the evidence as a whole did prove his guilt.

In light of the above, it is not improbable or unlikely that the trial court could have found defendant guilty by a reasonable or moral certainty.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

JIGANTI and LINN, JJ., concur.