THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY LEE WILLIAMS, Defendant-Appellant.

Fourth District   No. 4—83—0770

Opinion filed October 22, 1984.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Edward Litak, State's Attorney, of Danville (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Defendant, Johnny Williams, was convicted of murder and attempted rape following a jury trial. He was sentenced to natural life imprisonment for murder and a concurrent term of 30 years' imprisonment for attempted rape. Defendant appeals, raising 13 issues: (1) whether his arrest was illegal because there was neither consent nor exigent circumstances justifying a warrantless entry; (2) whether the trial court erred in denying defendant's motion to suppress statements which were allegedly involuntary because he had difficulty understanding the words "murder" and "waive"; (3) whether the trial court erred in prohibiting a defense expert from giving his opinion whether defendant was intelligent enough to understand the rights waiver form; (4) whether his constitutional right to a trial by a fair and impartial jury was violated when the trial court excused for cause all prospective jurors who expressed reservations about capital punishment;

(5) whether the examination of prospective jurors in accordance with the standards promulgated in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, resulted in the selection of a jury biased in favor of the prosecution; (6) whether defendant was denied his right to a fair and impartial jury because of the prosecution's use of peremptory challenges to exclude certain blacks from the jury on the basis of race; (7) whether the State proved defendant guilty of murder beyond a reasonable doubt; (8) whether the State proved defendant guilty of attempted rape beyond a reasonable doubt; (9) whether Dr. Sheldon Rudnick was a qualified expert in bite-mark comparisons; (10) whether permitting the jury to view photographs of the murder victim was prejudicial error; (11) whether it was reversible error to refuse the defense request that the jury be given both paragraphs of the circumstantial evidence instruction; (12) whether the trial court abused its discretion in sentencing defendant to natural life imprisonment for murder; and (13) whether the trial court erred in sentencing defendant to an extended term of imprisonment for attempted rape because it was not the most serious offense of which defendant was convicted. We affirm the convictions.

Defendant was charged with five counts of murder and one count of attempted rape stemming from the April 1, 1983, beating death of an 80-year-old woman at the Holland Apartments in Danville, Illinois. At about 9:15 p.m. on April 1, 1983, Pauline Hayne saw defendant inside the Holland Apartments. The victim was sitting in a chair by the elevator door, a short distance from the defendant. Defendant was wearing a blue or red jacket. At about 10 p.m., Hayne saw defendant run out of the building toward the parking lot of the Quality Inn. Defendant was not then wearing his jacket.

A short time later Officer Calvin Showers encountered defendant 2½ blocks away from the Holland Apartments. Defendant asked Showers for a ride home. Showers saw a large quantity of blood on the defendant's hands, arms, and clothing. The blood "pretty much covered" the defendant's hands and arms. The defendant was not wearing a jacket although it was cool and raining slightly. When asked about the blood, defendant said he had been in a fight but did not want to press charges. When questioned later, he was unable to state with whom he had the fight or where it had occurred. During the ride home, the defendant asked Showers, "Are you taking me to jail?" The defendant also said, "I got blood all over me, Cal Showers. I got blood all over me."

At about 11:35 p.m., the victim was found in the basement of the Holland Apartments. The body was nude from the waist down with

the exception of her pantyhose, which had been torn and pulled down to her ankles. A man's blue and orange coat and a blue comb were found near the body.

When defendant was later picked up at his home, he was still wearing the bloody clothes. The police officers who were with the defendant on April 2 and 3 noted that he had a small cut on his right hand, that his right hand was swollen, and that there were traces of blood under his fingernails and in the cracks of his skin. At the station, defendant's clothing was taken from him and he was given a pair of coveralls to wear. The forensic expert testified that the bloodstains on defendant's clothing were the same type as the victim's.

The defendant was interviewed by the police on April 2 and again on April 3. In these conversations, defendant repeatedly denied being given a ride home by Officer Showers. He also denied being near the Holland Apartments and claimed he had been in a fight with an unknown man at an unspecified location some 16 blocks from the crime scene. When confronted with the coat and comb found near the victim's body on April 2, the defendant initially said that he had been wearing a different coat. He then admitted that the coat and comb were his. The defendant stated, however, that they had not been found near where anyone was killed.

After being confronted with Hayne's statement that she saw him inside the building, the defendant admitted that he had seen her when he went into the apartment to visit some friends. Defendant admitted that his statement about the fight was not true and stated that he got the blood all over him when he tried to help a woman he had heard screaming in the basement. The defendant stated that he dropped her and fled when some lady yelled, "Leave that lady alone." When asked about a bloodstain in the elevator, the defendant stated that he had dragged the woman into the elevator and had taken her to the first floor, where he left her when confronted by the unknown woman.

■ Defendant first contends that his arrest was illegal because there was no consent or exigent circumstances justifying a warrantless entry. The evidence indicated that two police officers dressed in street clothes went to defendant's apartment at about 1 a.m. on April 2. Defendant's mother answered the door. The officers identified themselves to her, showed her their badges, and told her that they wanted to speak with the defendant. She recognized Officer Showers and invited both officers in. She pointed to the defendant, who was asleep on the couch. After defendant was awakened, the officers told him that they would like him to come with them to the station to talk with an investigator. Defendant agreed and the officers drove him to

the station.

The defendant filed a pretrial motion to quash arrest and to suppress evidence seized and statements made pursuant to the arrest. The motion alleged that the arrest was illegal because it was made without a warrant and no exigent circumstances existed to excuse a warrant. The trial court, in its written order denying the motion to quash arrest and suppress evidence, stated:

> "[T]he officers' entry was consensual. Officer Showers had shortly before let the defendant off at his direction at this building and address. When he knocked he was invited in by the defendant's mother without complaint by the defendant's brother. Evidence indicates that the defendant's mother may, in fact, reside in the next apartment. Legal residency is not the issue. The defendant's mother was clearly an occupant of the premises at the time she invited the officers in, and her invitation was a valid consent to enter. This was not, therefore, a nonconsensual entry. Consent must be voluntary, and under the totality of the circumstances, was here. Nor has the defendant under these facts adequately contested the validity of the consent voluntarily given by other occupants of the residence apartment."

Defendant contends that the trial court erred in finding that the entry was consensual because defendant's mother, who allegedly was not a resident of her son's apartment, did not have authority to consent to the police officers' entry to her son's apartment. In *People v. Taylor* (1975), 31 Ill. App. 3d 576, 333 N.E.2d 41, we held that the brother of the defendant, who did not reside with the defendant and his mother, could not consent to a search of their premises. Defendant, thus, argues that Mrs. Williams did not have authority to consent because she did not live with her son.

However, Mrs. Williams gave consent to *enter* the premises, not consent to search as in *Taylor*. In *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608, the supreme court upheld a warrantless consensual entry into an apartment where the officers were admitted into defendant's apartment by his mother. No showing was made in *Bean* that defendant's mother lived at that location. Likewise, this court upheld an entry to make an arrest where permission to enter was obtained from an unidentified person inside the home. (*People v. Bell* (1976), 41 Ill. App. 3d 233, 355 N.E.2d 38.) Therefore, the trial court did not err in finding that Mrs. Williams had the authority to consent to the police officers' entry into the home.

Furthermore, the State presented evidence that Mrs. Williams

was in her own home when the police arrived. At trial, Mrs. Williams expressly testified that the defendant was arrested in her home on the morning of April 2. Mrs. Williams was at the apartment in question at 8:30 p.m. on April 1 when the defendant returned home from visiting a friend, at about 9 p.m. on April 1 when the defendant left, and when the defendant was returned home by Officer Showers. Mrs. Williams was still at this residence at 1 a.m. when the police arrived to pick up the defendant. She was later contacted by the police on several occasions at this residence.

The defendant next addresses the argument that exigent circumstances did not exist to allow a warrantless entry. We need not address this issue, because we have found that the entry was consensual. Defendant's arrest was valid.

■ Defendant next contends that the trial court erred in denying his motion to suppress statements made by defendant. He contends that the statements were not voluntary because of the length of questioning, the conditions during questioning, and his limited intelligence. He also contends that he did not understandingly waive his constitutional rights.

On a motion to suppress a defendant's statements, the burden is on the prosecution to show by a preponderance of the evidence that the statements made were voluntary. (*People v. Jackson* (1968), 41 Ill. 2d 102, 242 N.E.2d 160; Ill. Rev. Stat. 1981, ch. 38, par. 114—11(d).) A confession is not voluntary if a defendant's will has been overborne at the time he confessed. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.) This determination must be based on a totality of the circumstances under which the confession was given. (*People v. Murdock* (1977), 50 Ill. App. 3d 198, 365 N.E.2d 1301.) The reviewing court's inquiry is limited to whether the trial court's finding is against the manifest weight of the evidence. *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68.

The police officers went to defendant's home at about 1 a.m. to ask him to come down to the station. He was asleep, but after he was awakened by his brother he voluntarily went with the police to the station. He was placed in an interview room, where he fell asleep. At about 7:25 a.m., he was given breakfast and the interview began.

Before the start of the interview, Lieutenant McGee read the defendant the *Miranda* warnings from a form and asked him to read it out loud. Defendant stated that he did not understand the use of the word "murder" on the form, explaining that he knew murder meant when someone was killed but that he had not murdered anyone. Defendant also expressed some lack of understanding about the

word "waive," and this word was explained to him. Defendant signed the rights waiver form after he finished reading each section.

Investigator Rory Steidl testified that defendant appeared to understand his rights and why he was being questioned. The defendant did not appear to be confused or disoriented. The defendant did not refuse to answer any questions, did not indicate that he wished to stop talking or speak to an attorney, and did not indicate that he was too tired or wanted to sleep. Lieutenant Edwin McGee stated that other than being fidgety, nervous, and "a little sleepy-eyed" there was nothing unusual about the defendant.

When the defendant asked to speak with his mother, the officers called her to come to the station. Questioning was discontinued until defendant's mother arrived. Lieutenant McGee stated that he had talked to defendant for about an hour between 7 and 10 a.m. on April 2. Defendant was questioned again about 3 p.m. on April 3.

Defendant was kept in a jail cell in the interim. On April 3, the defendant's rights were again read and explained to him and he read the rights form aloud and signed it. The defendant had no trouble reading the form and only questioned the word "murder," stating that he knew what this was but not why he was being charged. The defendant was not confused during the conversation of April 3. The defendant stated that he understood his rights and had no questions about them.

Dr. Dallas Grant also testified at the suppression hearing. Dr. Grant is a school psychologist and had given defendant intelligence tests on three different occasions. Defendant was found to be in the Educable Mentally Handicapped (EMH) group. At the suppression hearing, Dr. Grant examined a copy of the rights waiver form and gave his opinion that the waiver form contained words above defendant's reading level. Dr. Grant stated that his opinion was that defendant could not understand the rights waiver form, regardless of how he had been advised of his constitutional rights.

The Illinois Supreme Court has held that a mental deficiency alone is not enough to render a confession or statement involuntary, but rather it is one issue to be considered in the totality of the circumstances under which the statement was made. *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27; *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466.

The trial court denied the motion to suppress statements defendant had made because he found that the statements were made voluntarily and his rights understandingly waived. The police officers who interviewed defendant and observed defendant believed that he under-

stood his rights and voluntarily made statements to the police. The police explained the rights waiver form in terms that defendant could understand. Defendant read the form aloud and with little difficulty and signed the form. Defendant did have some difficulty with the words "murder" and "waive." However, after the officers explained these terms to him, he expressly stated that he understood. Furthermore, defendant's only problem with the word "murder" was that he did not understand why he was being charged with killing someone.

The manner in which a defendant answers questions can also be a factor in the totality of the circumstances test. (*People v. Carpenter* (1976), 38 Ill. App. 3d 435, 347 N.E.2d 781.) Defendant answered questions rationally. He contradicted himself several times in an attempt to exculpate himself. Defendant did not admit culpability. Defendant did not appear confused. He made requests to use the phone and asked for cigarettes, food, and soft drinks. These requests were honored. The officers limited the questioning of defendant to reasonable lengths of time on separate days. It cannot be said that his will was overborne or that he did not make the statements voluntarily.

Defendant cites our opinion in *People v. Devine* (1974), 17 Ill. App. 3d 1053, 309 N.E.2d 76, in support of his contention that his statements were not voluntary. In *Devine,* this court affirmed the trial court's suppression of certain statements and confessions. The defendant's confessions in *Devine* were found to be involuntary under unique circumstances: (1) the defendant was only 13 or 15 and had a mental age of 7; (2) the defendant was questioned continuously from 7:30 p.m. to 4 a.m.; (3) no inquiry was made by the police into the defendant's educational level prior to questioning; (4) defendant's request to speak with his mother was not honored; (5) the defendant cried and was incoherent when speaking to the police; (6) defendant made a suicide attempt; and (7) defendant was found incompetent to stand trial because he could not understand the charge or assist his attorney. In the case at bar, the only similarity is that the defendant is of limited intelligence. His conduct and manner in answering questions showed that he understood his rights and made voluntary statements.

We find that the trial court's denial of the motion to suppress defendant's statements was proper.

■ Defendant next contends that the trial court erred in not allowing Dr. Grant to testify at trial as to his opinion of defendant's ability to understand the rights waiver form.

At trial, Dr. Grant testified that intelligence tests which he administered to the defendant indicated that the defendant was of relatively limited intelligence. This testimony was relevant to the weight and

credibility to be given defendant's statements. The trial court had previously determined admissibility of the statements at the motion to suppress hearing. Dr. Grant was not permitted to testify as to his opinion regarding the defendant's ability to understand the rights waiver form.

In limiting the scope of testimony, the court stated:

> "I have passed on the issue of voluntariness and the jury may not redecide that issue. All you may go into is the circumstances under which the statement was made. Included in those circumstances would be evidence regarding the general I.Q. of the individual. But to allow you to go beyond that issue and attempt to litigate the issues of whether or not he understood by the use of an expert in my opinion is not permitted."

The defendant contends that this limitation deprived him of a fair trial since that evidence was relevant to the voluntariness of his statements to the police.

The Illinois Supreme Court stated the applicable rule in *People v. Cook* (1965), 33 Ill. 2d 363, 369-70, 211 N.E.2d 374, 377:

> "[T]he admissibility of a confession which is challenged on the ground that it is involuntary is a matter for the trial judge to determine in the first instance by a hearing out of the presence of the jury. [Citation.] If the court rules that the confession is voluntary and the confession is admitted in evidence, the defendant still has the right to present evidence to the jury which affects the credibility or weight to be given the confession."

Under *Cook*, the trial court properly allowed that portion of Dr. Grant's testimony which was relevant to the credibility of defendant's statements. The trial court properly admitted Dr. Grant's opinion that the defendant was of relatively limited intelligence because it was relevant to defendant's credibility. However, the trial court properly refused to admit Dr. Grant's testimony regarding the defendant's ability to understand the rights waiver form. Whether or not defendant understood his *Miranda* rights was relevant only to the admissibility of defendant's statements, and not the credibility of the statements. The trial court made the determination at the motion-to-suppress hearing that defendant's statements were admissible. The defendant is not allowed to present evidence at trial relating to the admissibility of his statements once the court has determined admissibility in a motion to suppress. Because the testimony that the trial court excluded was relevant only to the admissibility of the statements, and not credibility, the court properly refused to allow Dr. Grant's testimony about

defendant's ability to understand the rights waiver form.

■ Defendant argues that the trial court erred in "death-qualifying" the jury, pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. "Death-qualifying" a jury involves questioning prospective jurors during *voir dire* examination about their attitudes towards the death penalty. Pursuant to this process, five prospective jurors were excused for cause by the trial judge because of their attitudes against the death penalty. Defendant argues that this questioning during *voir dire* examination is improper because it amounts to a systematic exclusion of a legally cognizable group from jury service. However, the Illinois Supreme Court and this court have previously rejected this argument. *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346; *People v. Johnson* (1984), 123 Ill. App. 3d 1008, 463 N.E.2d 877.

■ Defendant next argues that a "death-qualified" jury is more likely to find a defendant guilty than a jury which is not questioned about their attitudes towards the death penalty. Defendant contends that he was denied his right to a fair trial. However, this court previously rejected this contention in *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 387 N.E.2d 1284.

■ Defendant next contends that he was deprived of a fair trial and an impartial jury by the prosecutor's alleged use of peremptory challenges to exclude blacks from the jury based solely on race. This court is bound by the Illinois Supreme Court's opinions in *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202, and *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, which expressly addressed and rejected this contention.

■ Defendant contends that the State did not prove beyond a reasonable doubt that he was guilty of murder. In the case at bar the State relied on circumstantial evidence. However, the burden of proof when the State relies on circumstantial evidence is the same as if the evidence is direct. It is proof beyond a reasonable doubt. *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220.

At about 9:15 p.m. on April 1, 1983, the defendant was seen inside the Holland Apartments by Pauline Hayne. At that time, the victim was sitting in a chair by the elevator door, a short distance from the defendant. The defendant was wearing a blue or red jacket. At about 10 p.m., Hayne saw the defendant run out of the building towards the parking lot of the Quality Inn. At that time, the defendant was not wearing his jacket.

Defendant asked Officer Showers for a ride home. Showers saw a large quantity of blood on the defendant's hands, arms, and clothing.

The blood "pretty much covered" the defendant's hands and arms. The defendant was not wearing a jacket. When asked about the blood, defendant said he had been in a fight but did not want to press charges. When questioned later he was unable to state whom he had the fight with or where it occurred. During the ride home, the defendant asked Showers, "Are you taking me to jail?" The defendant also said, "I got blood all over me, Cal Showers. I got blood all over me."

At about 11:35 p.m., the body of the victim was found in the basement of the Holland Apartments. A man's blue and orange coat and a blue comb were found near the body.

When confronted with the coat and comb found by the victim's body on April 2, the defendant initially said that he had been wearing a different coat. He then admitted that the coat and comb were his. The defendant, however, stated that they had not been found where anyone was killed.

After being confronted with Hayne's statement that she saw him inside the building, the defendant admitted that he saw her when he went into the apartment to visit some friends. At this point, the defendant admitted that his statement about the fight was not true and stated that he got the blood on him when he tried to help a woman he had heard screaming in the basement. The defendant stated that he dropped her and fled when some lady yelled, "Leave that lady alone." When asked about the bloodstain in the elevator, the defendant stated that he had dragged the woman into the elevator and taken her to the first floor, where he left her when confronted by the unknown woman.

The evidence supports a finding that defendant was guilty of murder beyond a reasonable doubt. The offense occurred between 9:15 p.m. and 9:51 p.m. on April 1. The blood in the elevator and streaks leading down the corridor in the basement suggested that the initial assault had probably occurred in or by the elevator, and that the victim was taken to the basement by her assailant, where the final assault had occurred. The victim had last been seen alive sitting next to the elevator, with the defendant standing a short distance away. The defendant was later seen running from the building and had bloodstains on his clothing of the same blood type as the victim. The defendant gave numerous inconsistent explanations for his presence at the crime scene and for the blood on his clothing. Finally, defendant's coat was found at the scene of the crime.

Defendant claimed to have heard a scream and when he found the victim tried to help her. However, the State presented testimony that the victim had a very soft voice and could hardly be heard in normal

conversation. Furthermore, defendant did not tell this story to the police initially. He told Officer Showers he had been in a fight and had blood all over him. In light of his own inconsistencies in telling the story and the other evidence, the jury was not required to believe defendant's story. We find that the jury verdict was supported by the evidence. The State proved defendant guilty of murder beyond a reasonable doubt.

Defendant contends that he was not proved guilty beyond a reasonable doubt of the attempted rape because the evidence failed to show that he had the intent to rape the victim. In an attempted rape conviction the State must prove that defendant intended to have sexual intercourse with the victim. (*People v. Stagg* (1963), 29 Ill. 2d 415, 194 N.E.2d 342.) This intent may be inferred from the conduct of the defendant, the character of the assault, the acts done, and the time and place of the occurrence. *People v. Oetgen* (1978), 62 Ill. App. 3d 29, 378 N.E.2d 1355; *People v. Hamil* (1974), 20 Ill. App. 3d 901, 314 N.E.2d 251.

When the victim's body was found, her stockings were found down at her ankles, one undergarment was found lying on her chest, and a pair of torn and bloodstained panties were found in another area of the basement. She was lying on her back with her legs and feet spread slightly apart. Vaginal and rectal swabs were taken from the body and testing revealed no semen present. The doctor that performed the autopsy stated that he found no injuries or abnormalities in his examination of the external genitalia.

The victim had been brutally attacked and dragged to an isolated place in the basement. Defendant suggests that her clothing could have been accidentally or incidently removed during the beating. However, it was her underpants and stockings which were removed. The evidence supports a finding that defendant was guilty of attempted rape beyond a reasonable doubt.

Several Illinois cases support this attempted rape conviction. In *People v. Bonner* (1967), 37 Ill. 2d 553, 229 N.E.2d 527, the court found that a violent assault made by the defendant on a woman, during which the victim was thrown to the ground, the defendant reached under her clothing to pull down her slip, tore her blouse, and tried to remove her skirt, was sufficient to establish attempted rape even though there had been no exposure of the genitals and no words manifesting the intent to rape. In *People v. Beason* (1975), 32 Ill. App. 3d 305, 336 N.E.2d 511, the court held that attempted rape was proved where the defendant was shown to have attacked a woman in a parked car, struck and choked her, pulled her into the back seat of

the car, and ordered her to take off her pants, and where the victim passed out and awoke to find that her blouse had been unbuttoned and her slacks and panties pulled down. Finally, in *People v. Almond* (1975), 31 Ill. App. 3d 374, 333 N.E.2d 236, evidence that the defendant assaulted the victim at 1 a.m., knocked her to the ground, choked her, dragged her towards an alley, and attempted to disrobe her was found to be sufficient to establish the intent to commit rape.

In view of the evidence and cases cited, we find that the attempted rape charge was proved beyond a reasonable doubt.

■ Defendant next contends that the trial court erred in allowing Dr. Sheldon Rudnick to give his opinion regarding the comparison of the bite marks on the victim's body to the defendant's mouth and teeth because Dr. Rudnick did not have sufficient experience to qualify as an expert in bite-mark comparison.

It is within the trial court's discretion whether an individual is qualified to testify as an expert. (*People v. Pappas* (1978), 66 Ill. App. 3d 360, 383 N.E.2d 1190; *People v. Beil* (1979), 76 Ill. App. 3d 924, 395 N.E.2d 400.) This decision will not be overturned on appeal unless clearly and prejudicially erroneous. (*People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528; *People v. Oberlander* (1969), 109 Ill. App. 2d 469, 248 N.E.2d 805.) We stated the applicable rule in *Beil*:

> "An individual will be permitted to testify as an expert when his experience and qualifications give him knowledge which is not common to the world and where his testimony will aid the jury in reaching its determination." *People v. Beil* (1979), 76 Ill. App. 3d 924, 929, 395 N.E.2d 400, 403.

Dr. Rudnick has worked in general dentistry for 19 years and has taught several classes in forensic identification, including bite-mark identification. He is deputy coroner in Champaign County and is associated with Burnham Hospital for the purpose of forensic odontology. Dr. Rudnick has received training in bite-mark comparison at respected institutions. However, he is not board-certified in the field of forensic odontology. He testified that he had only made one prior bite-mark identification. This identification involved a bite mark made in cheese. This case is his first comparison of a bite in human tissue.

Based on his qualifications, the trial court properly allowed Dr. Rudnick to testify as an expert. An expert need only have experience and knowledge which is not common to the world. (*People v. Beil* (1979), 76 Ill. App. 3d 924, 395 N.E.2d 400.) Dr. Rudnick had 19 years' experience in dentistry, had taken two courses specifically in bite-mark comparison, and had taught courses on the subject. Furthermore, his testimony only went as far as his expertise. He only

stated that the defendant could have made the bite mark in the victim's arm in that some of his teeth and his dental arch did match the bite mark.

Therefore, we find that the trial court properly allowed Dr. Rudnick's expert testimony.

■■ Defendant next contends that he was deprived of a fair trial because the jury was allowed to examine a number of photographs of the victim's body, including three photographs taken during the autopsy. Defendant contends that the photographs were cumulative, gory, and of no value other than to arouse the horror of the jury.

Where photographs are relevant to establish any fact in issue, they are admissible in spite of the fact that they may be gruesome. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208.) The trial court's decision to admit gruesome photographs will not be reversed unless an abuse of discretion can be shown. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) In *Lindgren*, the supreme court upheld the introduction of two photographs of the murder victim's body that showed the genital amputation and which were taken before the genitals were recovered from the victim's mouth.

The photographs in the case at bar depicted the victim's battered and bloody face and her partially unclothed body. The photographs were gory specifically because they showed the severity of the victim's injuries. The photographs also showed the position of the victim's body and the condition of her clothing. The photographs were relevant in showing how the murder had occurred and in showing intent to commit rape.

Three photographs were admitted which were taken during the autopsy. The State argues that these were relevant to assist the jury in understanding the pathologist's testimony and in showing the cause of death. These three photographs included a close-up of the victim's face, a photograph of the victim's naked body on the morgue table, and a close-up of one head wound. The photograph of the victim's naked body shows the incisions for the autopsy.

In comparison to *Lindgren*, we do not believe that these photographs were so gory or gruesome that any prejudicial effect outweighed the probative value. They are gruesome because they depict a gruesome offense. We find that the trial court did not abuse its discretion in admitting these photographs, because they were relevant to show the severity of the beating and to aid in the medical testimony of the cause of death.

■■ Defendant next contends that he was denied a fair trial be-

cause the trial court refused to give both paragraphs of the circumstantial evidence instruction to the jury, since the State's evidence was entirely circumstantial.

The jury was given the first paragraph of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.02 (2d ed. 1981), which states:

"Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of a defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

Defendant contends that the entire IPI Criminal No. 3.02 should have been given. The second paragraph states:

"You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence."

In *People v. Hammers* (1976), 35 Ill. App. 3d 498, 507-08, 341 N.E.2d 471, 477, we stated:

"[C]ourts of review of this State are extremely reluctant to rule that the failure to give the second paragraph of the instruction is reversible error. The committee notes are couched in terms limiting the times when it is permissible to give the second paragraph and not in terms of stating the times when that paragraph must be given. In *People v. Merkel* 23 Ill. App. 3d 298, 319 N.E.2d 77, it is stated:

'*** the failure of the trial court, if it were error, to give the second part of IPI-Criminal No. 3.02 does not require reversal unless it appears that justice has been denied or that the verdict resulted from such error.' (23 Ill. App. 3d 298, 302, 319 N.E.2d 77, 80.)"

In view of the evidence of guilt, it does not appear that the verdict resulted from the refusal to give the second paragraph of the instruction, nor does it appear that justice was denied. No reversible error.

▮▮▮ Defendant contends that the trial court abused its discretion in imposing natural life imprisonment as sentence because there was no showing that he could not be rehabilitated.

Section 11 of article I of the 1970 Constitution (Ill. Const. 1970, art. I, sec. 11) provides that "[a]ll penalties shall be determined both according to the seriousness of the offense *and with the objective of restoring the offender to useful citizenship.*" (Emphasis added.) However, the Illinois Supreme Court has stated that "[t]here is no indication that the italicized portion of section 11 is to be given greater con-

sideration than that which establishes that the seriousness of the offense shall determine the penalty." (*People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 556-57, 301 N.E.2d 300, 302.) On appeal, it is not the function of the reviewing court to substitute its judgment for that of the trial court merely because the appellate court might have weighed the factors differently or imposed a different sentence. *People v. Waud* (1977), 69 Ill. 2d 588, 373 N.E.2d 1; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

In the case at bar, the trial judge stated:

> "I am required, if I am to do my task in an appropriate manner, particularly in this case, to balance the possibility or potential for rehabilitation against the need to protect the public by removal of you from society; and I find little in the way of potential for rehabilitation."

We find from the trial judge's statements that he did weigh the defendant's rehabilitative potential in imposing sentence. The trial court also weighed the competing interest of society. We find that the trial court's determination was not an abuse of discretion.

■■■ The trial court imposed an extended sentence of imprisonment of 30 years for attempted rape. Defendant contends that the trial court erred in imposing this sentence because the attempted rape was not the most serious offense for which he was convicted.

Section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)) provides:

> "A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present."

Our supreme court recently addressed this issue in the case of *People v. Jordan* (1984), 103 Ill. 2d 192. The court held that when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class felony for which convictions were obtained. Because we are bound by this holding, we find that it was improper to sentence defendant to an extended term for the attempted rape conviction. It is therefore necessary that we reduce the sentence on the attempted rape conviction to a term of 15 years, the maximum for a Class 1 felony, to be served concurrently with the natural life sentence on the murder conviction. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1.

For the reasons stated, we affirm defendant's convictions and his sentence for murder and reduce his sentence on the attempted rape conviction.

Convictions affirmed; sentence for murder affirmed; sentence for attempted rape reduced.

MILLS, P.J., and GREEN, J., concur.