Stanley SEIVEWRIGHT, III, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 98–56.

Supreme Court of Wyoming.

May 31, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; and T. Alan Elrod, Assistant Public Defender. Argument by Mr. Elrod.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker, Assistant Attorney General. Argument by Ms. Baker.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

LEHMAN, Chief Justice.

A Natrona County jury found Stanley Seivewright III guilty of conspiracy, aggravated robbery, and aggravated burglary. On appeal, Seivewright's complaints revolve around the testimony of an orthodontist who concluded Seivewright had taken a bite from a piece of cheese found in the victim's kitchen. His chief complaint is that, despite repeated discovery requests, the State did not disclose the orthodontist's report and curriculum vitae. Because we conclude that the district court erred in failing to take any action to determine whether its discovery

order had been violated, we reverse and remand for a new trial.

## ISSUES

Seivewright presents the following issues: Did discovery violations and evidentiary errors deny Appellant a fair trial?

a. Did the State's failure to disclose information about an orthodontist which the State proffered as an expert deprive Appellant of his right to confront the witnesses against him through effective cross-examination?

b. Did the district court's failure to hold an evidentiary hearing on Dr. Huber's testimony deprive Appellant of a fair trial as it invited the jury to convict Appellant based on inadmissible evidence?

c. Can the combined prejudice of the State's refusal to abide by the district court's discovery order and the district court's erroneous rulings be dismissed as harmless error?

The State of Wyoming restates the issue: Whether appellant received a fair trial?

## FACTS

The victim testified to the following events. Around 9 a.m. on October 28, 1996, two masked men entered the Casper home of the victim as she and her two-year-old daughter watched television. The shorter of the two men pointed a gun at the victim and did the talking, asking the victim where her "stuff" was. When the victim proved uncooperative, the shorter man taped the victim's hands together with duct tape while the taller man held a gun. After the victim managed to break free from the initial taping, the shorter man then alternated between hitting the victim, taping her, and telling her to shut up. The shorter man also held a gun to the back of the victim's head and pulled the trigger. Although the victim heard a click, no bullet fired. The taping job was finally completed when the men taped the victim's head and hands to the headboard of her bed.

After the intruders left, the victim freed herself and telephoned the police. Her home had been ransacked, though it seemed only her wallet, containing $700, was missing from inside the home. Gone, too, was the victim's van, which was recovered a few days later. The victim also noticed, on a kitchen counter, a block of cheese with a bite taken out of it. The victim reported that no one in her family was responsible for the bite of cheese, and the block of cheese was taken into evidence.

After an investigation, Seivewright was arrested on November 21, 1996, and charged with aggravated burglary, aggravated robbery, and conspiracy. A search warrant issued permitting law enforcement to obtain a dental impression (dentition) from Seivewright, and the State retained Dr. Emerick Huber, a local orthodontist, to take Seivewright's dentition and to make an impression from the cheese.

Identity was the main issue at the trial of Seivewright and his codefendant. Over Seivewright's objection, Dr. Huber testified. On the basis of his comparison of the impressions from the cheese with Seivewright's dentition, Dr. Huber concluded that Seivewright was the person who bit the cheese. Seivewright offered no expert testimony on the subject.

The jury found Seivewright guilty of aggravated robbery, aggravated burglary, and conspiracy. The jury could not reach a unanimous verdict on the same charges against Seivewright's codefendant, and a hung jury resulted on all three charges. The jury further determined that Seivewright is a habitual criminal, and he was sentenced to a term of 20 to 25 years. This appeal followed.

## DISCUSSION

### Discovery Violations

Seivewright argues the State failed to disclose Dr. Huber's report and curriculum vitae, materials Seivewright contends were discoverable pursuant to a district court order. The district court's discovery order directed "[p]ursuant to Rule 26.2 of the Wyoming Rules of Criminal Procedure, to be produced before trial begins, any written or recorded statement of a witness ... in the possession of the attorney for the State of Wyoming or which the attorney for the State of Wyoming

may reasonably obtain and which relate to the subject matter about which the witness ... will testify."

Prior to trial, Seivewright filed a "Motion for *Daubert*[1] Hearing," which, in addition to requesting a hearing on the admissibility of expert testimony, requested "discovery related to this issue such as any reports, calculations, tests, examinations, and any other information this doctor used in arriving at his conclusions, as well as a copy of this doctor's curriculum vitae." The trial court did not rule on this request for discovery, and the State did not reply to the request. The State correctly points out that Seivewright did not schedule a pretrial hearing with the trial court for consideration of these matters. However, immediately before Dr. Huber testified, Seivewright requested a hearing to clarify what Dr. Huber's testimony would be and demanded the documents he requested in his pretrial motion. Specifically, Seivewright's counsel informed the court that, despite repeated requests to the prosecutor, he had not received a copy of Dr. Huber's curriculum vitae. Without argument from the State, the trial court denied Seivewright's motion and allowed the State to proceed with Dr. Huber's testimony "subject to objections to particular questions." After Dr. Huber completed his trial testimony, Seivewright moved to strike Dr. Huber's testimony, arguing the State failed to provide him with the report or the curriculum vitae in violation of the discovery order. The trial court denied this motion, without explanation.

The district court's failure to do anything to determine if there was a discovery violation is contrary to our case law and that of other jurisdictions which have considered the proper procedure for determining whether a statement or report of a State's witness should be produced upon demand by the accused. We have written:

> Although a defendant cannot obtain a review or combing of any or all reports having to do with interviews of witnesses, he is entitled to the production of a specific "statement." If he makes a prima facie

showing of a probable existence of a specific document but the State either denies its existence or that it is a "statement" within the definition of the rule, the trial court has the duty to determine such issues by *in camera* inspection or otherwise.

*Hubbard v. State*, 618 P.2d 553, 556 (Wyo. 1980) (citing *U.S. v. Nickell*, 552 F.2d 684, 688 (6th Cir.1977)) (court has "inherent power to require the prosecution to produce [witness statements] so that the defense may get the full benefit of cross-examination and the truth-finding process may be enhanced.") (quoting *U.S. v. Nobles*, 422 U.S. 225, 231, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141 (1975)); *Harney v. U.S.*, 306 F.2d 523, 533 (1st Cir. 1962); *U.S. v. Robinson*, 585 F.2d 274, 280–81 (7th Cir.1978) (once defendant meets burden of specifying with reasonable particularity that a certain document exists, that there is reason to believe it is a "statement," and that the government failed to provide it in violation of the Jencks Act, "a court must then conduct an *in camera* inspection to determine whether the document is both relevant and a competent 'statement.' "); *U.S. v. Resnick*, 483 F.2d 354, 358 (5th Cir.1973); *Jordan v. U.S.*, 633 A.2d 373, 375 (D.C.App. 1993) (The defendant has the burden of moving for production and is entitled to cross-examine witnesses to probe for the information. "The trial judge has the affirmative duty to determine, out of the presence of the jury, whether statements exist and are in the possession of the government, and if so, whether they qualify as statements under the [Jencks] Act." The trial court must conduct whatever inquiry is necessary to aid the judge in discharging this responsibility to enforce the statute. "The duty to determine whether a statement ... exists 'rests with the trial judge; neither party bears a burden of proof or persuasion that may skew the result.' "); Annotation, *Proper Procedure for Determining Whether Alleged Statement or Report of Government Witness Should be Produced on Accused's Demand, Under Jencks Act (18 U.S.C. § 3500)*, 1 A.L.R. Fed.

---

1. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993).

252 (1969).[2]

Seivewright made a "prima facie showing" of the probable existence of two statements, the report and the curriculum vitae, in his pretrial motion and again at trial. At the trial court level, the State neither denied their existence nor argued they were not statements within the definition found in W.R.Cr.P. 26.2. The documents were clearly in existence or reasonably obtainable before the discovery deadline. The State attempted to have the doctor's March 4, 1997 signed report admitted into evidence, and the doctor repeatedly referred to the report during his testimony. The doctor also admitted he had a curriculum vitae but failed to send it to the State. In addition, there is strong reason to believe both the curriculum vitae and the report are material statements under the rule because both could qualify as "written statement[s] ... adopted or approved by the witness." W.R.Cr.P. 26.2(f). In the case of an expert witness, in which qualifications go to both admissibility and weight, a vitae is material information by which the opposing party's counsel can challenge the expert's qualifications and credibility. *See, e.g., U.S. v. Mannarino,* 850 F.Supp. 57, 63 (D.Mass. 1994) (informant's handwritten list of criminal history is a "statement"). A signed report including measurements, observations, and conclusions can likewise be used to impeach the expert's analysis and conclusions. *But cf. Fortner v. State,* 932 P.2d 1283, 1286-87 (Wyo.1997) (decided under W.R.Cr.P. 16; no evidence supported defendant's claim that expert conducted tests or experiments). When a district court fails to consider a defendant's claim that the State is violating a discovery order and, therefore, the rules of criminal procedure, it fails to perform its duty. *Hubbard,* 618 P.2d at 556. When Seivewright moved for production of the statements, the trial court had a duty to determine, by *in camera* inspection or otherwise, whether the documents should be produced.

In accordance with W.R.Cr.P. 26.2, if a party elects not to comply with an order to deliver a statement, the district court has three options for sanctioning that behavior. The rule requires that the trial court "*shall* order" (1) that the witness not be permitted to testify; or (2) that the testimony of the witness be stricken from the record; or (3) if the attorney for the State elects not to comply, the court *shall* declare a mistrial if required in the interest of justice. W.R.Cr.P. 26.2(e). The rule is mandatory in all respects; it does not allow the district court any discretion to refuse to act in the face of uncontradicted allegations of discovery violations in a criminal prosecution. Allowing Seivewright to object to "particular questions" at trial is not one of the sanctions mandated by the rule. Thus, it cannot be argued that the district court's ruling was within the parameters of the rule despite its failure to determine if the discovery order had been violated.

When Seivewright alleged the State failed to comply with W.R.Cr.P. 26.2, the district court should have ordered the State to submit the documents for *in camera* inspection or held a hearing to determine whether the report and the curriculum vitae fell within the purview of the rule or the pretrial discovery order. Failure to take any action at all violated the rule and was reversible error.

Before moving on, we must address an issue raised at oral argument before this court. In the process of moving to strike Dr. Huber's testimony, Seivewright's counsel informed the district court that, while he had never been provided a copy of Dr. Huber's report, he had received a letter stating Dr. Huber's conclusions. At oral argument in this court, the State asserted that the report and the letter to counsel were alternate terms used to describe the same document. However, we have neither the letter nor the report before us to verify this assertion. If

---

2. The substance of the Jencks Act was later adopted into F.R.Cr.P. 26.2., which is comparable, although not identical, to W.R.Cr.P. 26.2. *See* 3B Charles Alan Wright, *Federal Practice and Procedure, Criminal,* App. C at 274–75 (1999); *Campbell v. U.S.,* 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); *State v. Watson,* 173 W.Va. 553, 318 S.E.2d 603, 609 (1984) ("Because many of the provisions of the Jencks Act are incorporated into Rule 26.2, commentators, as well as courts, have used Jencks Act cases to interpret it.")

counsel believed assertion of that fact was necessary at oral argument, the record should have been supplemented by the State in accordance with W.R.A.P. 3.04. No motion to supplement the record was made.

### Confrontation Clause

Seivewright also contends the State's failure to provide discovery of Dr. Huber's report and curriculum vitae deprived him of his constitutional right to confrontation. Because we are confident that, upon reversal, the district court will require compliance with its discovery order, this issue will not arise again, and we need not address it here.

### Expert Testimony

Seivewright complains the district court erred in failing to grant a hearing to determine the admissibility of Dr. Huber's testimony. When determining the admissibility of expert testimony, the district court's gatekeeping function requires it to perform several duties:

> First, the district court must determine whether the methodology or technique used by the expert to reach his conclusions is reliable. If so, the court must determine whether the proposed testimony "fits" the facts of the particular case.

*Bunting v. Jamieson*, 984 P.2d 467, 471 (Wyo.1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993)). In *Bunting v. Jamieson*, we cited *Daubert's* non-exclusive list of four criteria to be used to guide the trial court's assessment of reliability: 1) whether the theory or technique in question can be and has been tested; 2) whether it has been subjected to peer review and publication; 3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation; and 4) the degree of acceptance within the relevant scientific community. *Bunting v. Jamieson*, 984 P.2d at 472. These criteria, however, cannot be applied in every case: "[t]he initial step in reviewing the admissibility of expert testimony is the determination whether the *Daubert* factors apply to the specific testimony at issue. Where they are reasonable measures

of reliability, these factors should be considered." *Id.* at 475. We also emphasized that methodology

> should be distinguished from the conclusion of the expert. Thus, a trial judge need not and should not determine the scientific validity of the conclusions offered by an expert witness. Rather, to decide admissibility, the trial judge should only consider the soundness of the general scientific principles or reasoning on which the expert relies and the propriety of the methodology applying those principles to the specific facts of the case.

*Id.* at 472–73.

In performing our review, it is well established that the decision of the district court to admit or reject expert testimony is a decision solely within that court's discretion. *Springfield v. State*, 860 P.2d 435, 438 (Wyo. 1993); *Betzle v. State*, 847 P.2d 1010, 1022 (Wyo.1993); *Braley v. State*, 741 P.2d 1061, 1064 (Wyo.1987). Recently, we expanded on that standard of review.

> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. Our opinion in *Joiner* [*General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)] makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138–39, 118 S.Ct. 512. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.... Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.

*Bunting v. Jamieson*, 984 P.2d at 470 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999)). "Otherwise, the trial judge

would lack the discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. at 1176. The district court's decision to decline to hold a reliability hearing is therefore reviewed for an abuse of discretion. *Id.; U.S. v. Charley,* 189 F.3d 1251, 1266 (10th Cir. 1999); *U.S. v. Nichols,* 169 F.3d 1255, 1262–63 (10th Cir.1999).

Because Seivewright's motion for a *Daubert* hearing provided the district court with little reason to hold an evidentiary hearing to analyze Dr. Huber's testimony, we find no abuse of discretion in the district court's refusal to hold such a hearing. Seivewright's motion provided the district court neither with authority to establish the methodology or technique being applied was unreliable nor did it assert that another expert would refute reliability. In short, Seivewright did nothing more than boldly assert that Dr. Huber's testimony was unreliable. Under these circumstances, we conclude there was no abuse of discretion in the district court's refusal to hold a *Daubert* hearing.

Our conclusion on this issue requires examination of the scientific principle being applied. Bite mark identification is based on the theory of uniqueness. "Identification of a suspect by matching his dentition with a bite mark found on the victim of a crime [or a substance] rests on the theory that each person's dentition is unique." 1 Paul C. Giannelli and Edward J. Imwinkelried, *Scientific Evidence,* p. 583 (3rd ed.1999); *State v. Jones,* 273 S.C. 723, 259 S.E.2d 120, 124 (1979). Although several methods of bite mark analysis have been reported, "[a]ll methods involve three steps: (1) registration of the bite mark and the suspect's dentition, (2) comparison of the dentition and bite mark, and (3) evaluation of the points of similarity or dissimilarity." Imwinkelried at 585.

Seivewright does not seriously contend that bite mark identification is not a proper subject for expert testimony. Indeed, the courts faced with this question have unanimously concluded that bite mark comparison is a proper subject for expert testimony. *See* Annotation, *Admissibility of Evidence Tending to Identify Accused by His Own Bite Marks,* 77 A.L.R.3d 1122 (1977 & 1999 Supp.). While the majority of cases involve flesh bites, courts have also approved bite mark identification in cases involving various foods. *See State v. Ortiz,* 198 Conn. 220, 502 A.2d 400, 401 (1985) (partially eaten apple); *Banks v. State,* 725 So.2d 711, 714–16 (Miss.1997) (bologna sandwich; conviction reversed because state destroyed sandwich before defense could examine); *Doyle v. State,* 159 Tex.Crim. 310, 263 S.W.2d 779 (1954) (cheese, but not raised as issue on appeal). Given the wide acceptance of bite mark identification testimony and Seivewright's failure to present evidence challenging the methodology, we find no abuse of discretion in the district court's refusal to hold an evidentiary hearing to analyze Dr. Huber's testimony. The district court was simply exercising its "discretionary authority ... to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. at 1176, 143 L.Ed.2d 238. While this is not true for all subjects of expert testimony, we are comfortable that it is true under the circumstances of the case at bar.

Based on the foregoing, we also conclude that *Bunting v. Jamieson,* 984 P.2d 467, is distinguishable. There we wrote:

> [W]e believe that the trial court's decision to dispose of a case by precluding expert testimony requires the same level of judicial explanation supporting its discretionary decision as the admission of testimony under the catch-all exception. A single conclusory statement applying one nondispositive *Daubert* factor is insufficient.

*Id.* at 475. Read too broadly, this statement could be interpreted to require findings in every case of expert testimony. However, not every subject of expert testimony is appropriate for application of the *Daubert* factors. *Bunting v. Jamieson,* 984 P.2d at 475.

Moreover, unlike the expert testimony in *Bunting v. Jamieson,* the reliability of the expert's methods (bite mark identification) can be taken for granted in this case, and findings were unnecessary. On a related note, to the extent Seivewright challenges Dr. Huber's conclusion that Seivewright bit the cheese, these challenges go to the weight of the testimony, not to reliability of the methodology (bite mark identification), and are matters best left to a jury. *Id.* at 472–73. We find no abuse of discretion in the district court's refusal to hold a *Daubert* hearing.

 Seivewright also complains that the district court's failure to hold a hearing resulted in the admission of inadmissible testimony. He contends the testimony was inadmissible because Dr. Huber was not qualified to offer expert testimony in the field and that the doctor's admissions under cross examination bear this out. In reviewing the qualification issue, we keep in mind that the determination of the qualification of a witness as an expert is vested within the discretion of the trial court and that determination will be overturned only when an abuse of discretion is shown. *Betzle v. State,* 847 P.2d at 1022; *Montoya v. State,* 822 P.2d 363, 366 (Wyo.1991); *Noetzelmann v. State,* 721 P.2d 579, 583 (Wyo.1986). Unless a expert witness is clearly unqualified, deficiencies in qualifications normally go to the weight accorded the witness's testimony rather than its admissibility. *Betzle,* 847 P.2d at 1023.

 In attacking Dr. Huber's qualifications, Seivewright's chief complaint is that Dr. Huber was not qualified to offer expert testimony because he is not certified by the American Board of Forensic Odontologists (ABFO), which has established standards for qualification to testify as an expert in the field of forensic odontology. However, Seivewright directs us to no authority establishing that ABFO certification is a prerequisite to testifying as an expert in the field of forensic odontology. Indeed, an expert need only have sufficient "knowledge, skill, experience, training, or education" to qualify as an expert. W.R.E. 702. Therefore, the question is simply whether Dr. Huber was qualified to testify despite his lack of ABFO certification.

The record establishes that Dr. Huber has been a practicing orthodontist for nearly 20 years. In addition to being a board certified orthodontist with a master's degree in the field, he previously qualified to testify as an expert. He has also worked in the field of forensic odontology, for the local coroner, since 1980 and has completed numerous courses in that field. Given these credentials, we can find no abuse of discretion in permitting Dr. Huber to testify despite his lack of ABFO certification. *See People v. Williams,* 128 Ill.App.3d 384, 83 Ill.Dec. 720, 470 N.E.2d 1140, 1150 (1984) (Trial court properly allowed dentist to testify as bite mark identification expert despite lack of board certification in field of forensic odontology. "An expert need only have experience and knowledge which is not common to the world.").

 Seivewright also complains Dr. Huber was not qualified to testify because of admissions the doctor made under cross-examination. In addition to admitting he was not an expert, but "most qualified," Dr. Huber stated that, without training as a dentist or orthodontist, even Seivewright's trial counsel could have rendered an opinion on whether a particular person took a bite of a piece of cheese. It is, however, the function of the jury to sort out the weaknesses and the strengths of expert testimony. *Betzle v. State,* 847 P.2d at 1023; *Runnion v. Kitts,* 531 P.2d 1307, 1309 (Wyo.1975). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Bunting v. Jamieson,* 984 P.2d at 471 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 596, 113 S.Ct. at 2798).

We find an analogous situation in *Runnion v. Kitts,* 531 P.2d at 1310. There, a highway patrolman offered expert testimony on the speed of the plaintiff's vehicle at the time of its collision with the defendant's. On appeal, the plaintiff complained the patrolman's testimony was improper because he admitted he was not an expert. This court wrote:

With some modesty, the highway patrolman, on cross-examination, in answer to the question, 'You don't qualify yourself as an expert?', replied, 'No.' Regardless of how the witness classified himself, he did [d]o a pretty good job and was expert, in the light of his experience and knowledge and ability to use the skid calculator tools given to him by the highway department, which had an accepted basis in accident investigation. Apparently, the jury was not impressed that he was as uninformed as the cross-examiner attempted to make him out.

*Runnion v. Kitts*, 531 P.2d at 1310. The situation here is similar, and we conclude Dr. Huber's statements go to the weight to be given his testimony, and not to admissibility.

Finally, Dr. Huber's testimony was more involved than his admission under cross-examination would indicate and thus helpful to the trier of fact. Not only did he make the impressions of the cheese and Seivewright's teeth, Dr. Huber performed a more thorough examination than the naked-eye analysis suggested by defense counsel. Dr. Huber explained how he measured the teeth spacings in reaching his conclusions, explained in detail the peculiar idiosyncracies found in Seivewright's dentition, and ultimately concluded that Seivewright had bitten the cheese. The testimony was thus helpful to the trier of fact, and we find no abuse of discretion in its admission.

### CONCLUSION

The district court's failure to determine compliance with its discovery order requires reversal in this instance. The judgment and sentence entered in the district court is reversed, and this case is remanded for a new trial.

THOMAS, Justice, dissenting, with whom HILL, Justice, joins.

I dissent from the resolution of this case according to the majority opinion. It treats the failure to furnish the curriculum vitae of an expert witness to the defense as error per se. I have some question as to whether it constituted error at all, but I am convinced that, conceding error for purposes of this debate, any error was harmless. The majority opinion, with respect to the claims of error by Stanley Seivewright, can be briefly summarized. First, it holds that the failure of the trial court to take any of the steps articulated in W.R.Cr.P. 26.2 was reversible error. Then it is noted that Seivewright had received a letter stating Dr. Huber's conclusions. The claim of violation of the constitutional right to confrontation was not addressed, as well it should not be. The majority opinion then addresses the failure to hold a so-called *Daubert*[1] hearing, and rules that no abuse of discretion occurred with respect to the failure to hold such a hearing. Next, the majority refutes the argument that the orthodontist was not qualified to offer expert testimony. The net effect is that no error occurred in the admission of the testimony of the orthodontist into evidence, but reversible error occurred because the trial court never ordered the production of the report or the curriculum vitae prior to trial.

One would normally expect some explanation of how that failure was prejudicial, but prejudice is simply assumed, not explained. Before the orthodontist testified, defense counsel offered these objections:

Your Honor, I had filed a motion I believe back in late May, where I requested a *Daubert* hearing concerning the State's evidence of their expert witness, Dr. Huber. And I would request again that we have a hearing—a *Daubert* hearing—with respect to that type of testimony.

My understanding is that the State's evidence is going to be that the dentist can offer testimony concerning dental impressions of this piece of cheese that has been admitted into evidence.

I would challenge this type of testimony as being—as not being proven to have been scientifically reliable, and I think we

**1.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

need a hearing to clarify what exactly the testimony is.

I would further add, Your Honor, that when I filed this motion, I had requested that I be provided with the dentist's credentials, and I have talked to [the prosecutor], I believe, a couple of times and have asked him just before I approached the podium here today, and I asked if he had the dentist's credentials, and he does not.

So I have not seen what the dentist's credentials are and whether or not he's ever done this type of thing before or whether or not he's qualified to do it. And I feel those are issues that we need to get into before he is allowed to testify. And I would demand that the State provide those documents to me before the witness takes the stand and testifies in this courtroom.

Defense counsel then made no effort, nor was any request submitted, to conduct a *voir dire* of the orthodontist prior to his testimony being received. Defense counsel did successfully object to the admission into evidence of the report, which the orthodontist referred to throughout his testimony. When the conclusion of the orthodontist was offered, defense counsel renewed the objection previously stated, and objected to testimony relating to the cheese because it had not been admitted into evidence for failure to establish the chain of custody. The orthodontist then explained what he had done in order to compare Seivewright's dental characteristics with the block of cheese. On cross-examination, defense counsel questioned the orthodontist extensively about his education, special training and experience with respect to testifying. In the course of his testimony, the orthodontist testified that he never had accomplished the delivery of his curriculum vitae to the district attorney.

At the conclusion of the orthodontist's cross-examination and redirect examination, defense counsel renewed his objections, saying:

Your Honor, I would again like to renew my Motion to Strike the Testimony of Dr. Huber. I believe it is inadmissible for two reasons. One is that I believe my request for a *Daubert* hearing is now deemed appropriate. I believe the doctor testified to scientific types of information, which I believe had to be deemed appropriate prior to his testimony.

Also, the second reason I would move to strike is that his entire testimony was in violation of this Court's discovery order. First off, we did not receive any information whatsoever dealing with his credentials, and obviously that affects my ability to cross-examine and to effectively represent my client.

Furthermore, he testified that he took calculations and notes of his analysis. Well, we had absolutely no information on his analysis. *All we have is one letter basically—or stating his conclusions.*

And, Your Honor, to effectively represent my client, I obviously need his analysis and any other information pertaining to that. And I believe any expert testifying—if they are going to testify to any scientific knowledge or anything involving any type of scientific analysis or mathematical analysis—the defense is entitled to that information prior to coming to court for being able to cross-examine him, and also for being able to evaluate that and determine whether or not we need to have someone else evaluate it and determine if it's valid or not.

Your Honor, the State has had months and months and months to provide that information. They had never done so. The witness gets on the stand and says, "I just didn't provide my curriculum vitae to the district attorney after being asked to do so, because I didn't get around to it."

Your Honor, that is no reason for my client to suffer prejudice when he's looking at life in the penitentiary, because this doctor didn't get around to it. For those reasons, Your Honor, I move to strike.

(Emphasis added.) The nature of the prejudice suffered is not identified, beyond the claim that it is present, any more than it is identified in the majority opinion.

The foregoing tells me that Seivewright wanted neither the so-called report nor the curriculum vitae, but he wanted the opportunity to complain about not having them. Trial began on June 30, 1997 and it continued

through July 3, 1997. The Motion for *Daubert* Hearing was filed on May 27, 1997, and it recites, among other things, as a reason for the motion:

1. The state has presented evidence to defense counsel that it intends to introduce evidence of bite analysis concerning the defendant. Specifically, the state intends to introduce evidence that the defendant took a bite out of a piece of cheese while inside the complaining witnesses' home. The state seized defendant's false teeth and had Emerick Huber, D.D.S., M.S., conduct an examination of the cheese as well as defendant's teeth. Dr. Huber concluded that defendant's dental impression matches the dental impression taken from the piece of cheese taken from the home.

It is clear to me that as of May 27, 1997, defense counsel had enough information to know what the orthodontist was going to testify about, and at least enough information to include his dental degree and his masters degree in the motion. The defense must have had a copy of the report, which was offered as a prosecution exhibit and excluded when Seivewright objected.

The Stipulated Order Requiring Discovery was filed on March 7, 1997, but according to the orthodontist's testimony, his notes of measurements were discarded after he formulated his conclusion from the examination he conducted in late February, and likely were not available as of the time of the discovery order. In any event, there is nothing to demonstrate prejudice as a result of those notes not being available. The thrust of the orthodontist's testimony was not much more complicated than matching pieces of a picture puzzle.

We have formalized in our Wyoming Rules of Appellate Procedure and our Wyoming Rules of Criminal Procedure the concept of harmless error. The appellate rule provides:

Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court.

W.R.A.P. 9.04. The criminal rule provides:

(a) *Harmless error.*—Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

W.R.Cr.P. 52(a). We have declared that the criminal rule is procedural in nature, and it did not adjust the substantive law in any way. *Hays v. State,* 522 P.2d 1004, 1007 (Wyo.1974).

In applying these rules, we have said:

"If the trial court erred by admitting evidence, we then must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless. The harmless error standard is set out in W.R.A.P. 9.04:

'Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court.'

*See also* W.R.Cr.P. 52. An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. *Kolb v. State,* 930 P.2d 1238, 1247 (Wyo.1996); *Kerns v. State,* 920 P.2d 632, 641 (Wyo.1996). To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.' *Johnson v. State,* 790 P.2d 231, 232 (Wyo.1990); *see also Roderick v. State,* 858 P.2d 538, 550 (Wyo.1993)."

*Ryan v. State,* 988 P.2d 46, 52–53 (Wyo.1999) (*quoting Solis v. State,* 981 P.2d 34, 36 (Wyo. 1999)). The difficulty with the majority opinion in this case is that it does not articulate how these standards were satisfied any more than Seivewright does in his brief and argument.

It is clear from the record that prior availability of the report of the orthodontist and his curriculum vitae could not have affected the cross-examination by the defense attorney. The orthodontist testified that he substantially reported the curriculum vitae during direct examination by the prosecuting attorney. Defense counsel did not request the opportunity to *voir dire* the orthodontist prior to his testimony about the cheese and the dental impressions. Instead, he chose to attack that by cross-examination, which may

have been a strategic decision. Counsel may have preferred that there be no ruling on the expert qualifications of the orthodontist prior to his testimony because had he objected to the qualifications, the trial judge obviously would have overruled that objection. It is abundantly clear from the record that the defense had available, at or prior to the cross-examination, the report of the orthodontist, although he testified that notes and measurements he made to construct his letter report had been destroyed.

The majority opinion does not include in the discussion of the facts other evidence that has a clear impact upon any prejudice to Seivewright. The day before the robbery, Seivewright told his neighbor that he and his co-defendant intended to rob some females on Pine Street, which is the street where the victim's home is located. The information given the neighbor included the fact that Seivewright would do the "manhandling" and the accomplice would do the talking. The victim testified she would have recognized Seivewright's voice since she had known him for three years. Seivewright's co-defendant's ex-girlfriend testified that Seivewright and the co-defendant stayed at her house overnight before the robbery. They left the morning of the robbery around 8:45 a.m., and the robbery was initiated around 9:00 a.m. They returned about 10:00 a.m., divided some cash, and joked about the robbery, including the fact that they had taken the victim's van. The ex-girlfriend witnessed the two men changing clothes, and she saw Seivewright pull out a gun and lay it on a table. An inmate who had been in jail with Seivewright testified that he overheard Seivewright talking about the robbery, and later Seivewright told him that he had perpetrated the robbery.

All this makes it clear beyond any peradventure of any doubt that there was no "'reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred.'" *Ryan*, 988 P.2d at 52 (*quoting Solis*, 981 P.2d at 36). Seivewright has failed to meet his burden of showing "'"circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play."'" *Ryan*, 988 P.2d at 52–53 (*quoting Solis*, 981 P.2d at 36). His conviction should be affirmed. The State of Wyoming, Natrona County, and the citizens should not have to bear the expense of another four-day trial in this case. It is not appropriate to impose that burden because of the identification of technical error.